THE WASHINGTON TIMES, Petitioner,

v.

DISTRICT OF COLUMBIA DEPART-
MENT OF EMPLOYMENT SER-
VICES, Respondent.

Ty Clevenger, Intervenor.

No. 97–AA–1512.

District of Columbia Court of Appeals.

Argued Dec. 10, 1998.
Decided Feb. 25, 1999.

James A. Borer, Washington, DC, for petitioner.

Sharman J. Monroe, Washington, DC, for respondent.

Before WAGNER, Chief Judge, SCHWELB, Associate Judge, and PRYOR, Senior Judge.

SCHWELB, Associate Judge.

The Washington Times (the employer) has asked this court to review a decision of the Director of the Department of Employment Services (DOES or the agency) in which the Director held that Ty Clevenger, formerly a reporter for the Times who had been discharged for unsatisfactory performance, was entitled to receive unemployment compensation benefits. The employer claims that the Director made various legal errors requiring reversal. We reject most of the employer's contentions, but remand the case for clearer and more explicit findings.

## I.

### THE AGENCY PROCEEDINGS

A. *The evidence.*

Clevenger came to work for the Times on or about August 8, 1995. He did not perform his duties to the employer's satisfaction during his initial probationary period. On January 4, 1996, Clevenger received a generally unfavorable performance evaluation, but was retained in a probationary status for four more months. On or about May 7, 1996, Clevenger was advised that his writing and reporting abilities remained substandard, and his employment with the Times was terminated.

On May 23, 1996, Clevenger filed a claim for unemployment compensation benefits pursuant to D.C.Code §§ 46–101 *et seq.* (1996). On June 3, 1996, a DOES claims examiner found Clevenger to be eligible for the requested benefits.[1] The employer objected to the claims examiner's ruling, contending that Clevenger had been discharged for misconduct, and that he was therefore ineligible for benefits. *See* D.C.Code § 46–112. On July 24, 1996, an evidentiary hearing was held before a DOES appeals examiner.

The employer's sole witness at the hearing was Kenneth M. McIntyre, the Metro editor of the Times. McIntyre testified that he was in charge of the Metro desk and its eight editors and fifteen reporters. Although McIntyre had general oversight responsibility over all of these employees, Clevenger's work was directly supervised by two of the editors, Bernard R. Dagenais and Joseph Curl.

McIntyre testified that Clevenger's performance was deficient in a number of respects. He claimed that Clevenger failed to attend staff meetings and other meetings, omitted important information from his stories, missed deadlines, pitted editors against one another, and failed to respond appropriately to criticism designed to improve his performance. Much, if not most of McIntyre's assessment of Clevenger's work was, however, based on information that McIntyre received from other editors who had regular direct contact with Clevenger.[2]

The employer also introduced into evidence the report of Clevenger's January 1996 performance appraisal, which was prepared by Dagenais, Curl and McIntyre, as well as portions of the log maintained by Dagenais. The performance appraisal contained many criticisms of Clevenger's work,[3] occasional

1. After explaining that the employer had failed to respond to an invitation to submit information relevant to Clevenger's claim, the claims examiner wrote:

 Based on claimant's statement and the absence of evidence from employer I conclude that claimant is highly credible. No misconduct on the part of the claimant. In accordance with Title 7 DCMR [§ ] 3, Employer has the responsibility to support such allegation.

2. For example, McIntyre believed that Clevenger had missed staff meetings in the plural. He had personal knowledge, however, of only one such meeting. With respect to that meeting, Clevenger testified that he had called in sick after having made an emergency trip to the hospital the night before. A log maintained by Dagenais contained a notation that Clevenger had a doctor's appointment on the morning in question, but that Clevenger had not received advance permission to miss the meeting.

3. *E.g.,* "[e]very editor on the desk has expressed concern about Ty's work, attitude and ability to do the job with minimal supervision. He does not follow explicit instructions . . . .";

praise,[4] but little if any indication of willful misconduct.[5] In his log, Dagenais concluded that "Ty has shown a willingness to work but hasn't used his time wisely," and complained, *inter alia*, that Clevenger "chose to fight his editors rather than learn from them," that he did inadequate research and missed significant stories, and that although Clevenger's attitude might have improved in the period preceding his dismissal, the "attitude shift" did not have a significant impact on Clevenger's work.

Clevenger testified on his own behalf and painted an entirely different picture of the situation at the Metro desk. He claimed that his difficulties at the Times had their genesis in the inability of the editors who supervised him to get along with one another. According to Clevenger, the editors repeatedly gave him conflicting instructions, and one editor would berate him for carrying out the directives of a different editor. Clevenger asserted that morale among the reporters was very low and resulted in a high turnover rate. He stated that the editors were frequently abusive to him and to other reporters. Clevenger testified that he complained to Dagenais that reporters were being blamed for mistakes made by editors, and he stated that after he had done so, "everything hit the fan," and he was "scapegoated" in retaliation for standing up to the abuse. Clevenger denied the employer's allegation that he was unwilling to learn:

> I said from the outset, the first day I came to the Washington Times, I was green, I knew I had a lot to learn. And I was willing to learn. I—to the day I was fired, I was willing to learn. What I was not willing to do was to be belittled and insulted and kicked around like some kind of football. That I was not willing to do and I stood up against that.

---

4. *E.g.*, "Ty is bright, curious and informed. He appears to be passionate about the importance of

"a growing negative attitude is giving Ty the reputation of a whiner and editor shopper";

"Ty veers from contagious enthusiasm to unprofessional negativism in the course of a story's development. Rather than delivering what is asked, he readily complains about assignments or editors and becomes easily dejected about his failure to get ideas into print."

## B. *The appeals examiner's decision.*

On August 2, 1996, the appeals examiner issued a brief written decision in which she ruled in favor of the employer. The examiner described Clevenger's unfavorable performance appraisal in January 1996, and noted that he was placed on a second period of probation at that time. The examiner then faulted both Clevenger and his superiors, as follows:

> The claimant missed important deadlines (vital in the newspaper business), faulted others for his deficiencies, pitted editors against each other, displayed a progressively negative attitude and missed staff meetings.

> The employer was slanderous to the claimant, ill treated its staff, and had unclear lines of authority between line staff and the various editors.

Emphasizing that by the end of his second period of probation, Clevenger had reason to know of the employer's dissatisfaction with him, the examiner concluded that

> the employer was attempting to work with an employee, who was not able to receive corrective criticism. The Examiner finds that the employer has met its burden of proof sufficient to support a finding of gross misconduct pursuant to 7 DCMR [§ ] 312.3 [1994].

The examiner therefore held that "the claimant becomes ineligible for benefits."

## C. *The Director's decision.*

Clevenger filed an internal appeal with the agency's Office of Appeals and Review (OAR). On July 30, 1997, the OAR issued a proposed decision reversing the appeals examiner's decision in a one-page order, the operative portions of which read as follows:

> his work. He shows a willingness and eagerness to plug away at a challenge. Some of his story ideas show an uncommonly sharp understanding of the newspaper's identity. He gives a strong appearance of wanting to succeed."

5. Under the heading of "Ability to Learn," the report states that "Ty seems unwilling—rather than unable—to learn how to be a better reporter day by day."

In the instant case, the Claimant was alleged to have committed any [sic] acts of misconduct which resulted in his disqualification for gross misconduct. However, the testimony offered at the Hearing consisted of no witnesses that could testify to any acts of misconduct other than the main supervisor.

However, there were no corroborating witnesses and the Claimant adamantly stated that he was doing the best job he could do under the circumstances. The burden to prove misconduct or gross misconduct is on the Employer and in this case, the Employer has not met its burden of proof.

The Employer alleged issues of not completing jobs, but this was always countered by testimony by the Claimant indicating he had more than one editor telling him what to do as a new reporter, working for *The Washington Times*. There was no rebuttal evidence given by other editors on the job, or any one to indicate that the Claimant, in fact, had committed any act of misconduct of a deliberate nature.

In summary, the overall testimony does not support any acts of willful misconduct on the part of the Claimant and he should not be denied benefits in this case.

Over the employer's objection, the OAR's proposed decision became the Director's final decision on August 28, 1997. The employer filed a timely petition for review in this court.

## II.

## LEGAL DISCUSSION

A. *The standard of review.*

 Under the District of Columbia Administrative Procedure Act (DCAPA), D.C.Code §§ 1–1501 *et seq.* (1992), we must sustain the decision of the agency unless it is unsupported by substantial evidence in the record. *See, e.g., Wallace v. District Unemployment Compensation Bd.,* 294 A.2d 177, 178–79 (D.C.1972). "The scope of our review is limited to whether substantial evidence supports the Department's determination that the reasons for claimant's discharge did not amount to statutory misconduct." *Keep*

*v. District of Columbia Dep't of Employment Servs.,* 461 A.2d 461, 462–63 (D.C.1983) (per curiam). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wallace, supra,* 294 A.2d at 179 (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). In order to pass muster under the DCAPA,

(1) the [agency's] decision must state findings of fact on each material, contested factual issue;

(2) those findings must be based on substantial evidence; and

(3) the conclusions of law must flow rationally from the findings.

*Perkins v. District of Columbia Dep't of Employment Servs.,* 482 A.2d 401, 402 (D.C. 1984) (citations omitted).

 In the present case, the Director of the DOES reversed the decision of the appeals examiner. Such a reversal implicates a separate standard of review within the agency. The Director of the DOES lacks authority to review *de novo* the examiner's resolution of a factual issue. *Santos v. District of Columbia Dep't of Employment Servs.,* 536 A.2d 1085, 1088 (D.C.1988). "When OAR reviews an appeals examiner's decision, due deference must be accorded [to] the credibility determinations of the examiner who heard and evaluated the evidence." *Coalition for the Homeless v. District of Columbia Dep't of Employment Servs.,* 653 A.2d 374, 376 (D.C. 1995) (citations and internal quotation marks omitted). The OAR "may not reject an appeals examiner's findings of disputed fact ... unless the examiner's findings are unsupported by substantial evidence." *Id.* at 377 (citations omitted).

B. *Statutory and regulatory background.*

 The District's unemployment compensation law was designed to protect employees against economic dependency caused by temporary unemployment and to reduce the need for other welfare programs. *Jones v. District of Columbia Unemployment Compensation Bd.,* 395 A.2d 392, 395 (D.C.1978) (citations omitted). The statute is "remedial humanitarian legislation of vast import," and

its provisions must be "liberally and broadly construed." *Cruz v. District of Columbia Dep't of Employment Servs.*, 633 A.2d 66, 69 (D.C.1993) (citation omitted).

■ Employees who have been discharged for misconduct are ineligible for immediate benefits. *See, e.g., Hickenbottom v. District of Columbia Unemployment Compensation Bd.*, 273 A.2d 475, 477 (D.C.1971).[6] As a result of recent amendments, our statute now differentiates between "gross misconduct," *see* D.C.Code § 46–111(b)(1), and misconduct "other than gross misconduct," § 46–111(b)(2).[7] *See generally, District of Columbia v. District of Columbia Dep't of Employment Servs.*, 713 A.2d 933, 936–37 (D.C.1998) (hereinafter *D.C. v. DOES* ) (explicating history of recent amendments). The statute further provides that the agency shall "add to its rules and regulations specific examples of behavior that constitute misconduct within the meaning of this subsection." § 46–111(b)(3).

> The regulations define gross misconduct as an act which deliberately or willfully violates the employer's rules, deliberately or willfully threatens or violates the employer's interests, shows a repeated disregard for the employee's obligation to the em-

ployer, or disregards standards of behavior which an employer has a right to expect of its employee.

7 DCMR § 312.3 (1994).[8] The term "other than gross misconduct" means

> an act or omission by an employee which constitutes a breach of the employee's duties or obligations to the employer, a breach of the employment agreement or contract, or which adversely affects a material employer interest. The term "other than gross misconduct" shall include those acts where the severity, degree, or other mitigating circumstances do not support a finding of gross misconduct.

7 DCMR § 312.5.[9]

■ We recently had occasion to note that "much of the language of the *Hickenbottom* standard appears in the current (1994) version of the regulations [defining 'gross misconduct' and 'other than gross misconduct']." *D.C. v. DOES, supra*, 713 A.2d at 937 n. 8. Precedents under the *Hickenbottom* standard therefore retain their relevance. Applying *Hickenbottom*, we have stated:

> While unsatisfactory work performance may amount to "misconduct" in some instances, implicit in this court's definition of "misconduct" is that the employee in-

---

**6.** *Hickenbottom's* definition of misconduct was as follows:

> Misconduct must be [1] an act of wanton or willful disregard of the employer's interest, [2] a deliberate violation of the employer's rules, [3] a disregard of standards of behavior which the employer has the right to expect of his employee, or [4] negligence in such degree or recurrence as to manifest culpability, wrongful intent, or evil design, or show an intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to the employer.

273 A.2d at 477–78 (citation omitted).

**7.** The period of disqualification for an employee discharged for gross misconduct is longer than the corresponding period for an employee discharged for misconduct other than gross misconduct.

**8.** The following examples of gross misconduct are provided:

> Gross misconduct may include but is not limited to the following:
> a. Sabotage;
> b. Unprovoked assault or threats;
> c. Arson;

d. Theft or attempted theft;
e. Dishonesty;
f. Insubordination;
g. Repeated disregard of reasonable orders;
h. Intoxication, the use of or impairment by an alcoholic beverage, controlled substance, or other intoxicant;
i. Use or possession of a controlled substance;
j. Willful destruction of property;
k. Repeated absence or tardiness following warning.

7 DCMR § 312.4.

**9.** The following examples of "other than gross misconduct" are provided:

> Other than gross misconduct may include, but is not limited to the following:
> a. Minor violations of employer rules;
> b. Conducting unauthorized personal activities during business hours;
> c. Absence or tardiness where the number of instances or their proximity in time does not rise to the level of gross misconduct;
> d. Inappropriate use of profane or abusive language.

7 DCMR § 312.6.

tentionally disregarded the employer's expectations for performance. Ordinary negligence in disregarding the employer's standards or rules will not suffice as a basis of disqualification for misconduct.

*Keep, supra,* 461 A.2d at 463. The fact that an employee's discharge appears reasonable from the employer's perspective does not necessarily mean that the employee engaged in misconduct. *Cruz, supra,* 633 A.2d at 69 (citations omitted).

 "The party alleging misconduct shall have the responsibility to present evidence sufficient to support a finding of misconduct by the Director." 7 DCMR § 312.2; *see also Keep, supra,* 461 A.2d at 463 (citation omitted) ("the employer has the burden of proving misconduct"). "In an appeal hearing, no misconduct shall be presumed." 7 DCMR § 312.8.

### C. The employer's claims of error.

Having described the applicable legal landscape, we now turn to the specific claims of error advanced by the employer in support of its petition for review.

### (1) The OAR's alleged refusal to consider probative evidence.

The employer asserts that the OAR failed to give appropriate consideration to the employer's "second witness" and to the documentary exhibits presented by the employer at the hearing before the appeals examiner. We do not agree.

A part of the employer's contention is based on a fallacious premise, for there was no "second witness." The only witness who testified on the employer's behalf was the Metro editor, Kenneth M. McIntyre. James A. Borer, Esq., Deputy Legal Counsel for the Washington Times, appeared at the hearing as the attorney for the employer. He questioned the witnesses and made a closing argument on behalf of his client. Mr. Borer is also counsel for the employer in this court, and he prepared the employer's brief and presented oral argument. As the employer's attorney, however, he could not and he did not testify as a witness at the evidentiary hearing, nor did he claim to have first-hand knowledge of the facts.

The employer also complains that the Director did not properly consider the exhibits—Clevenger's performance appraisal and Dagenais' log. The employer states in its brief in this court that these allegedly excluded exhibits contained "the overwhelming majority of the evidence of Claimant's misconduct," and it is true that McIntyre's testimony provided little, if any, such evidence. But the exhibits were admitted into evidence by the examiner, and they were part of the record before the OAR and the Director. The issue, correctly analyzed, is not whether the Director excluded the employer's documentary evidence, but whether the exhibits were accorded appropriate weight.

The applicable regulation explicitly provides:

> In an appeal hearing, the persons who supplied the answers to questionnaires or issued other statements alleging misconduct shall be present and available for questioning by the adverse party.

7 DCMR § 312.9. Section 312.9 was read into the record by the appeals examiner shortly after the hearing began. Nevertheless, neither Dagenais nor Curl was called as a witness for the employer. The Director thus correctly found that, aside from the "main supervisor" (McIntyre), "the testimony offered at the [h]earing consisted of no witnesses that could testify to any acts of misconduct," and that there was "no rebuttal evidence given by other editors on the job" to Clevenger's own testimony.

The regulations further provide:

> In an appeal hearing, prior statements or written documents, in the absence of other reliable corroborating evidence, shall not constitute evidence sufficient to support a finding of misconduct by the Director.

7 DCMR § 312.10. In the present case, according to the employer, the "overwhelming majority" of the evidence of misconduct was contained in "prior statements or written documents." The employer's sole witness, McIntyre, was in no position to contradict Clevenger's testimony regarding Clevenger's dealings with Dagenais and Curl, the co-authors of these written materials. There was no error by the Director in this regard.

(2) *"Arbitrary and capricious" reversal of the appeals examiner's decision.*

The employer next contends that "without opportunity to observe the claimant, the [Director] arbitrarily and capriciously reversed the finding of the [a]ppeals [e]xaminer." In our view, the Director's action was supported by substantial evidence, and it was not arbitrary or capricious within the meaning of the DCAPA. *See* D.C.Code § 1–1510(a).

As noted in our discussion of the standard of review, the Director was required to accord appropriate deference to the appeals examiner's credibility determinations. We do not read the Director's decision, however, as overruling any evidentiary finding made by the examiner. On the contrary, the Director could accept the findings of the examiner for which there was record support and nevertheless reasonably conclude that the examiner erred in finding gross misconduct.

We are handicapped in some measure by the cryptic and conclusory character of the decisions both of the examiner and of the OAR. It is difficult, in the case of the examiner's decision, to discern the precise basis for the finding of gross misconduct. In support of that finding, the examiner wrote that Clevenger

1. missed important deadlines;
2. missed staff meetings; [10]
3. faulted others for his own deficiencies;
4. pitted editors against each other;
5. displayed a progressively negative attitude; [11] and
6. was unable to receive corrective criticism.

It appears that in the examiner's view, the sixth of these items was, at least, the straw that broke the camel's back. The examiner also found, however, that Clevenger's superiors were "slanderous" to him, ill-treated the staff, and lacked clear lines of authority.[12] The examiner's order thus depicts a working environment in which supervisors abused Clevenger and other reporters and in which Clevenger complained and tried to shift any blame from himself to the editors.

Given the "unclear lines of authority," the Director could reasonably conclude, without questioning the examiner's findings, that "missed deadlines" and a single missed staff meeting (which Clevenger failed to attend for medical reasons) were no more than "ordinary negligence in disregarding the employer's standard or rules," *Keep, supra,* 461 A.2d at 463, and thus fell short of this court's definition of misconduct. The examiner's other four criticisms go to Clevenger's attitude and implicate volitional acts, but they hardly rise to the level of the examples of gross misconduct enumerated in 7 DCMR § 312.4, see note 8, *supra,* or in the definition of misconduct in *Hickenbottom, supra,* 273 A.2d at 477, quoted in note 6, *supra.* Moreover, Clevenger's superiors wrote in his unfavorable performance evaluation that Clevenger appeared "passionate about the importance of his work," and "willing and eager to plug away at a challenge." See note 4, *supra.* Considering the record as a whole, and the mistreatment of employees at the Metro desk in particular, the Director could properly rule, as a matter of law, that although Clevenger's attitudinal shortcomings, as described by the appeals examiner, were significant, they did not constitute conduct warranting denial of compensation benefits under a remedial humanitarian statute which the Director was required to construe generously.

(3) *The sufficiency of the Director's findings.*

Finally, the employer asserts that "[i]ncredibly, the Department's final decision

---

10. As we have noted, however, there was direct testimony only as to one such staff meeting, which Clevenger apparently missed as a result of a medical problem. There was also evidence, not cited by the examiner, that Clevenger failed to attend events relevant to stories on which he was working.

11. According to Dagenais' log, however, Clevenger's "attitude" improved in some measure, but not sufficiently.

12. Although the examiner did not expressly find that Clevenger received conflicting instructions, the finding as to lack of clear lines of authority—which appears twice in the examiner's brief order—appears to sustain Clevenger's uncontradicted testimony in this regard.

made absolutely no findings with respect to Claimant's alleged misconduct which The Times contends precipitated his discharge." Although the employer has not specified the relief which it seeks for this alleged violation, the logical remedy would bé a remand for more detailed findings.

■ The evidentiary findings in this case were made by the appeals examiner, not by the Director. Although, as we explain below, the Director's decision might have been clearer on the point, we do not read it as rejecting the examiner's factual determinations, except that the Director concluded, correctly in our view, that a finding of misconduct could not properly be based on materials written by Curl and Dagenais when neither of these men testified at the hearing. See 7 DCMR § 312.9, discussed in Part II C(1), supra. The Director apparently concluded, as a matter of law, that the testimony of the sole live witness—McIntyre—was insufficient to establish misconduct warranting the denial of unemployment compensation benefits.

According to the employer, "[t]he primary material contested issue in this case is, of course, whether Claimant was discharged because of his misconduct, in which event he would not be entitled to receive unemployment compensation benefits." In our view, however, the employer casts as an issue of fact a question which is in reality one of law. It is not seriously disputed that Clevenger's conduct, as described by McIntyre and found by the appeals examiner, resulted in Clevenger's discharge.[13] The question dividing the parties is whether Clevenger's actions constituted misconduct, gross or simple, warranting denial of benefits.

■ Nevertheless, the Director's decision, as written by the OAR, is so conclusory, and leaves so much to inference, that we are not prepared to affirm it without some clarification from the agency. Assuming that the Director intended to sustain the examiner's factual findings except insofar as the examiner relied on writings by Dagenais and Curl, that intention should be made explicit, so that this court is not left to guess at the meaning of the order under review. Where, as here, the Director has reversed the decision of the primary fact-finder, the Director should clearly specify

(1) which, if any, factual findings by the examiner the Director has rejected for lack of support in the record;

and

(2) which, if any, factual findings by the examiner the Director has sustained.

In this case, a remand for more elaborate findings might arguably be viewed as superfluous. The Director apparently held as a matter of law that the appeals examiner's factual findings do not support her conclusion that gross misconduct occurred, and we perceive no error in that holding. Indeed, the Director concluded that *no* misconduct was shown, and we would find it difficult to set aside that determination under the applicable standard of review.

■ We have noted, however, that the statute and regulations now deal separately with gross misconduct and with non-gross, or simple, misconduct.[14] An employee who has been exonerated of gross misconduct may still be found to have engaged in simple misconduct. There is nothing in the Director's decision to indicate that any inquiry was made regarding whether Clevenger had

13. We note, however, that Clevenger claimed to have been mistreated and ultimately discharged in reprisal for protesting against unfair treatment of reporters, including himself. The appeals examiner found that ill-treatment of the staff did take place, but she did not address Clevenger's allegations of retaliatory motive. Although a finding on this issue would certainly have been appropriate, the Director could properly conclude, regardless of the disposition of the retaliation issue, that there was no statutory misconduct on Clevenger's part.

14. The legislative history of D.C.Code § 46–111(b)(2) is not enlightening on the issue at hand. The proponent of the amendment stated only that the proposed statute "provides for an eight week penalty for separation for simple misconduct with an eight week reduction in entitlement." *See* page 2 of the testimony of DOES Director Maria Borrero, which appears as Attachment I to Council of the District of Columbia, Committee on Labor, Report on Bill 10–52, The District of Columbia Unemployment Compensation Improvement Amendments Act of 1993. (May 11, 1993).

engaged in misconduct other than gross misconduct, or that any attempt was made to apply the definition of such misconduct in 7 DCMR § 312.5, or the examples enumerated in § 312.6, to the evidence in this case.

■■■■ It is this court's responsibility, in reviewing an agency decision, to assure that the agency has taken a "hard look" at the issues in the case. *See Eilers v. District of Columbia Bur. of Motor Vehicles Servs.,* 583 A.2d 677, 686 (D.C.1990) (quoting *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)). As we stated in *Dietrich v. District of Columbia Bd. of Zoning Adjustment,* 293 A.2d 470, 473 (D.C. 1972),

> the function of the court in reviewing administrative action is to assure that the agency has given full and reasoned consideration to all material facts and issues. The court can only perform this function when the agency discloses the basis of its order by an articulation with reasonable clarity of its reasons for the decision.

In this case, the agency has failed even to mention the existence of two statutory levels of. misconduct, and a reviewing court should not assume that the issue has been considered *sub silentio* when there is no discernible evidence that it has.[15] The relatively new provisions in the regulations relating to gross misconduct and simple misconduct have not yet been construed by this court, *but cf. D.C. v. DOES, supra,* 713 A.2d at 936–37 &

n. 8, and they merit careful consideration by the agency; this court accords great deference to an agency's construction of its own regulations. *Tenants of 738 Longfellow St., N.W. v. District of Columbia Rental Hous. Comm'n,* 575 A.2d 1205, 1213 (D.C.1990). On remand, the Director must explicitly focus on the applicability of these regulations to this record.

## III.

## CONCLUSION

■■■ Although there is evidence in the record which would support an award of unemployment compensation benefits to Clevenger, the agency's findings of fact and legal conclusions are insufficiently specific for effective judicial review, especially with respect to the issue of simple misconduct. Accordingly, the decision of the Director is vacated and the case is remanded for additional findings and conclusions, and for such other proceedings, consistent with this opinion, as the Director deems appropriate.

*So ordered.*

---

15. The Director held, as we have noted, that "[t]he burden to prove misconduct, or gross misconduct is on the Employer ...." It is conceivable that this phraseology was designed to distinguish between the two kinds of misconduct recognized in the statute and regulations. If this is what was intended, then the allusion is simply too indirect and nebulous to pass muster.