Heidi A. BURGE, Petitioner

v.

DISTRICT OF COLUMBIA DEPART-
MENT OF EMPLOYMENT SER-
VICES, Respondent

Women's National Basketball Associa-
tion, T/A Washington Mystics, and
Risk Enterprise Management, Ltd.,
Intervenors

No. 02–AA–547.

District of Columbia Court of Appeals.

Argued Feb. 12, 2003.
Decided Feb. 19, 2004.

Benjamin T. Boscolo, Greenbelt, MD, for petitioner.

Clifton M. Mount, Washington, for intervenors. D. Stephenson Schwinn and Clinton R. Shaw also entered appearances for intervenors.

Arabella W. Teal, Interim Corporation Counsel at the time the briefs were filed, and Charles L. Reischel, Deputy Corporation Counsel at the time the briefs were filed, submitted a statement in lieu of brief for respondent.

Before TERRY, STEADMAN, and FARRELL, Associate Judges.

TERRY, Associate Judge:

Petitioner Heidi Burge, a former professional basketball player with the Washington Mystics, filed a claim for workers' compensation benefits [1] based on an injury she suffered in August 1998 while playing basketball for the Mystics. In July 2001 an administrative law judge ("ALJ") held an evidentiary hearing to determine, among other things, whether Ms. Burge's disability was the result of that injury and whether she was therefore entitled to compensation for lost wages.

About three months later, the ALJ issued a Compensation Order. She found that Ms. Burge had suffered a work-related injury, but denied her claim for lost wage benefits because she concluded that Ms. Burge had ceased playing basketball for personal reasons unrelated to that injury. Ms. Burge appealed this finding to the Director of the Department of Employment Services ("DOES"), who in due course affirmed the Compensation Order, ruling that it was supported by substantial evidence. Ms. Burge now seeks review in this court. For the reasons that follow, we affirm the Director's decision.

I

After playing on several women's basketball teams in the United States and in Europe, Ms. Burge was drafted by the Washington Mystics during the Women's National Basketball Association ("WNBA") expansion draft in 1998. In the spring of that year, she signed a one-year contract with the Mystics, with an option for a one-year extension. In a game at Washington's MCI Center in August 1998, Ms. Burge was injured when she jumped for a rebound and landed on her left hip after an opposing player accidentally knocked her legs out from under her while she was in the air. Although she stayed in the game for the next few minutes, she eventually had to come out because the pain became too intense. In the days that fol-

1. See D.C.Code § 32–1501 et seq. (2001).

lowed, Ms. Burge began feeling extensive pain from muscle spasms in her lower back and left leg.[2] During the team's next game in New York, Ms. Burge attempted to shoot a lay-up, but her left leg gave way, and she was forced to take herself out of the game. Shortly thereafter, Ms. Burge was treated by a physician from the home team, the New York Liberty, who said that she appeared to have nerve damage and recommended an x-ray.[3]

Upon returning to Washington, Ms. Burge was treated by the Mystics team physician, Dr. Mark Connell. After the season ended a week or so later, Ms. Burge went home to Los Angeles and continued treatment there with a physical therapist, Michael Schlink. While undergoing physical therapy, she was also training to get in shape for the upcoming basketball season in Europe; that training included such activities as riding a bicycle, running, lifting weights, and playing volleyball.[4]

In November 1998 Ms. Burge changed physical therapists because she was not fully satisfied with the results she was obtaining from Mr. Schlink. She began to receive treatment from a chiropractor-therapist, Brad Barez, with whom she remained for several months until the beginning of the next WNBA season in May 1999. Ms. Burge testified that as a result of her treatment by Dr. Barez, she felt markedly better, and that she was in good physical condition and believed she was capable once again of playing professional basketball.

When she tried out for the Mystics in the spring of 1999, Ms. Burge passed the physical and made no complaints to team officials about hip or lower back pain.[5] In her testimony before the ALJ, however, Ms. Burge said that there was really no time since her fall during the game in August 1998 that her hip did not bother her to some degree. During the latter stages of training camp, Ms. Burge broke a finger on her left hand and was told by team physicians not to play for six weeks. Ms. Burge was released by the Mystics on June 7, 1999, without being signed to a contract extension, for what were described as "qualitative reasons."[6] She was paid, however, until July 12, 1999.

2. This was not the first time that Ms. Burge had experienced pain in her lower back. She testified that before signing her contract with the Mystics, she suffered from back pain while playing for a team in Italy in 1995. Although she was treated for it, Ms. Burge explained that the pain was not serious and that she did not miss any games as a consequence, even though an x-ray revealed a degenerative disc.

3. In fact, Ms. Burge suffered from what was later diagnosed as a sacroiliac injury to her left hip joint, causing it to dislocate on occasion or when aggravated.

4. It was typical for female players to play for European teams in the off-season because the WNBA season lasted only from May to August and the players' salaries were modest. In the fall of 1998, however, Ms. Burge did not travel overseas to play basketball because she re-injured her hip while playing with her nephew and felt uncomfortable about signing a contract with a foreign team which would require her to declare that she was in good health. Despite injuring herself while playing with her nephew, however, Ms. Burge still tried out for the Mystics the following spring.

5. Ms. Burge did experience some pain during her tryout with the Mystics in the spring of 1999, but she did not tell team officials because she was afraid that if she did so, she might not make the team. She went to a private physical therapist, Elizabeth Fryer, so that she could obtain treatment for her injury without the knowledge of the Mystics.

6. By the terms of Ms. Burge's contract, the Mystics had a right to terminate the contract for the 1999 season before the season started if Ms. Burge did not exhibit sufficient skill to be a member of the team.

After being released by the Mystics, Ms. Burge was offered lucrative contracts to play in France for the 1999 and 2000 seasons, but she declined those offers because she was not willing to sign a contract that required her to state she was in good physical health in light of her ongoing hip problem. Ms. Burge was also invited to become what was known as a "replacement player" in the WNBA, but she never followed up on that invitation with the appropriate league officials. Instead, Ms. Burge moved to Houston in August of 1999 to pursue a career in sports broadcasting; after a six-week internship, however, she concluded that this was not a suitable career option for her. She nevertheless remained in Houston to be with her fiancé, who lived there. Thereafter Ms. Burge took classes and became a registered massage therapist. She also married her fiancé.

On cross-examination, Ms. Burge testified that in the fall of 1998 she had minimal symptoms of pain and felt "very confident" about playing basketball. She also said that she felt good enough to play in Greece at that time before tryouts with the Mystics in 1999. On January 27, 1999, Ms. Burge sent a letter to the Mystics team physician stating that she was "playing and running and living without pain." She also acknowledged playing full-court basketball on a hardwood floor against men almost every day during the winter of 1998–1999, and by February 1999 she was working out for at least three or four hours a day. Ms. Burge admitted, however, that she lacked a desire to return to basketball after the Mystics released her because she was interested in settling down and having a family.

In her Compensation Order the ALJ found that the August 1998 hip injury was the source of Ms. Burge's current and ongoing hip problems, and that she was therefore entitled to reimbursement for medical expenses related to that injury.[7] The ALJ also determined that Ms. Burge's average weekly wage, for purposes of paying back wages, was $1,595.30.[8] However, the ALJ ruled that Ms. Burge's "loss of earnings as a professional basketball player [was] due to her own personal decision not to continue with her career and not the result of the injury of August 9, 1998." Accordingly, Ms. Burge was awarded no benefit for lost wages. The Director of DOES affirmed that ruling.

## II

This court "will not disturb an agency decision if it rationally flows from the factual findings on which it is based and if those findings are supported by substantial evidence." *Children's Defense Fund v. District of Columbia Dep't of Employment Services*, 726 A.2d 1242, 1247 (D.C.1999) (citations omitted). Further, "the mere existence of substantial evidence contrary to [the factual findings] does not allow this court to substitute its judgment for that of the [agency]." *Spevak v. District of Columbia Alcoholic Beverage Con-*

---

7. The ALJ expressly rejected the assertion that Ms. Burge's injury was the result of her playing with her nephew.

8. The Mystics disputed the weekly wage figure because, although Ms. Burge had what was described as a one-year contract, she was actually paid for the duration of the WNBA season, which ran only from May through August. Before and after the season, she played on other teams, made commercials, and ran sports camps. The Mystics urged that Ms. Burge's weekly wage be calculated by dividing the WNBA contract's value ($22,000) by 52 weeks. Ms. Burge, however, pressed for the inclusion of what she earned before and after the season so that the total would be a more accurate weekly wage. The ALJ ultimately sided with Ms. Burge, and the Mystics do not contest that decision.

*trol Board,* 407 A.2d 549, 554 (D.C.1979) (citation omitted). Similarly, this court defers to the decision of the Director of DOES so long as his decision is supported by substantial evidence. *See, e.g., Washington Times v. District of Columbia Dep't of Employment Services,* 724 A.2d 1212, 1216 (D.C.1999); *Washington Metropolitan Area Transit Authority v. District of Columbia Dep't of Employment Services,* 683 A.2d 470, 472 (D.C.1996). Therefore, we must affirm the Director's ruling unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See Olson v. District of Columbia Dep't of Employment Services,* 736 A.2d 1032, 1037 (D.C.1999); *Teal v. District of Columbia Dep't of Employment Services,* 580 A.2d 647, 650 (D.C.1990).

Ms. Burge maintains that because she suffered an injury during an August 1998 WNBA game, which was later characterized as career-ending, she should be entitled to compensation for lost wages from the date of that diagnosis forward. While this assertion may have some merit in the abstract, Ms. Burge's argument overlooks other critical evidence in the record that makes her position ultimately meritless. *See, e.g., Powers v. District of Columbia Dep't of Employment Services,* 566 A.2d 1068, 1069 (D.C.1989) (when an employee leaves work voluntarily, or for reasons unrelated to a workplace injury, compensation for lost wages is not warranted).

 Under the Workers' Compensation Act ("the Act"), once a claimant demonstrates that a disability resulted from a work-related injury, there is a presumption that his or her claim comes within the provisions of the Act. *See* D.C.Code § 32–1521 (2001); *see also Ferreira v. District of Columbia Dep't of Employment Services,* 531 A.2d 651, 655 (D.C.1987). In order to benefit from this presumption, a claimant must present some evidence of a "work-related event, activity or requirement which has the *potential* of resulting in ... [a] disability." *Ferreira,* 531 A.2d at 655 (emphasis in original). Ms. Burge cleared this hurdle by demonstrating that her original hip injury occurred while she was playing for the Mystics in August of 1998, at a time when she was still under contract with the team.

 When proving the extent of the injury suffered, however, the claimant is not afforded a similar presumption. *See Landesberg v. District of Columbia Dep't of Employment Services,* 794 A.2d 607, 612 (D.C.2002). "Instead, the claimant [has] the burden of proving the nature and extent of her disability.... The Act is a wage loss statute, and disability means injury that results in wage loss." *Id.* (citations omitted). The ALJ found, and the Director affirmed her finding, that Ms. Burge failed to establish that her injury while playing basketball in the WNBA was the cause of her current and future wage loss because the evidence showed that she voluntarily left her basketball career for reasons unrelated to her injury.

Ms. Burge acknowledged during her testimony before the ALJ that she sent a letter to the team physician stating that she was "playing and running and living without pain." She also noted that in the fall of 1998 she had minimal symptoms of pain and felt "very confident" while playing basketball. She testified in addition that she played full court basketball almost every day during the winter of 1998–1999, and that by February 1999 she was working out for three to four hours a day. Unfortunately, when tryouts took place in the spring of 1999 for the Mystics, Ms. Burge did not make the team. The reason given by the team, however, had nothing to do with Ms. Burge's hip injury.

More significantly, Ms. Burge testified that she lacked a desire to return to bas-

ketball after the Mystics released her because she was more interested in settling down and having a family. Ms. Burge had several opportunities to play basketball elsewhere after being released by the Mystics in the spring of 1999, but chose instead to seek a career in sports broadcasting instead of playing. She also wanted to spend time with her new fiancé. When the potential career in sports broadcasting did not pan out, she changed career goals and ended up as a registered massage therapist. The fact that Ms. Burge chose voluntarily to pursue other interests after being released from the Mystics when she had opportunities to continue playing basketball, both in the United States and abroad, is fatal to her current claim for lost wages. *See Powers,* 566 A.2d at 1069 (denial of benefits affirmed because claimant voluntarily limited his income); 4 LARSON'S WORKERS' COMPENSATION LAW § 84.04(2) (2000) (compensation can be denied if an individual leaves work for reasons unrelated to an injury).[9] In light of these facts, which are essentially undisputed, it was neither arbitrary nor capricious for the Director of DOES to affirm the ALJ's decision. *See Teal,* 580 A.2d at 650.

In claiming entitlement to benefits, Ms. Burge relies heavily on a letter from Dr. Edward Lewis, dated December 13, 2000, stating that her work-related injury had reached a point at which playing professional basketball was no longer an option

for her.[10] Even though this letter provides a diagnosis of Ms. Burge's condition that renders her incapable of playing professional basketball in the future, this court will nevertheless affirm the Director's decision so long as it is otherwise supported by substantial evidence. *See Hively v. District of Columbia Dep't of Employment Services,* 681 A.2d 1158, 1160–1161 (D.C. 1996) ("we sustain the agency decision even in cases in which other, contrary constructions may be equally as reasonable as the one adopted by the agency"). More importantly, Dr. Lewis' letter was written after Ms. Burge voluntarily chose to leave the game of basketball to pursue other interests. While its effect on these proceedings might (or might not) have been different if it had been written earlier, it is clear from the record that during the period between Ms. Burge's injury in August 1998 and Dr. Lewis' diagnosis in December 2000, Ms. Burge made decisions concerning her basketball career that were entirely independent of her injury. Dr. Lewis' letter cannot overcome that fact, nor can it retroactively alter or nullify the reasons for her decision to end her career in professional basketball. The ALJ found that those reasons were personal and were not related to her injury. That finding is well supported by substantial evidence and was properly affirmed by the Director.

For this reason our recent decision in *Mills v. District of Columbia Dep't of Em-*

9. *See also Feisco v. Powell,* 538 So.2d 967 (Fla.Dist.Ct.App.1989) (benefits denied after claimant failed to prove her leave of absence from job was related to injury); *Gowdey v. Newburgh City School District,* 261 A.D.2d 663, 689 N.Y.S.2d 718 (1999) (voluntary withdrawal from labor market resulted in denial of benefits); *State ex rel. Chrysler Corp. v. Industrial Comm'n,* 62 Ohio St.3d 193, 580 N.E.2d 1082 (1991) (retirement for reasons unrelated to injury precluded award of disability benefits).

10. Intervenors argue that Ms. Burge should be precluded from recovering lost wages from December 13, 2000, forward because she failed to make this specific claim during the hearing below. While it is true that before this court Ms. Burge has enlarged the period for which she seeks recovery of lost wages, her reason for seeking them has remained constant. Accordingly, we will not bar her from asserting this claim now, since the basis of her claim of entitlement to lost wages has been the same throughout these proceedings.

*ployment Services,* 838 A.2d 325 (D.C. 2003), is of no help to Ms. Burge. *Mills,* like this case, involved a former player for the Mystics who had suffered an injury during a game and was seeking disability benefits. In *Mills,* however, there was no indication that the petitioner had decided to end her athletic career voluntarily, as there is in the instant case; rather, it appeared that she might have had a contract to play overseas had it not been for her injury. Because the Director had not adequately addressed this aspect of her claim, we remanded the case for further proceedings. In this case, by contrast, there is no need for a remand because the evidence shows, and the ALJ found, that Ms. Burge made a clear-cut decision to end her basketball career and seek another type of employment.

Ms. Burge's reliance on our decision in *Upchurch v. District of Columbia Dep't of Employment Services,* 783 A.2d 623 (D.C. 2001), is likewise misplaced. In *Upchurch* this court remanded a case to DOES for further proceedings in light of evidence that the claimant had been denied benefits because he was terminated for reasons unrelated to his workplace injury. *Id.* at 627. We went on to say that termination could not provide a sound reason for denying benefits. *Id.* at 628. In Ms. Burge's case, however, the evidence shows that she *voluntarily* left her career as a professional athlete to pursue other interests, unlike the claimant in *Upchurch.* Although Ms. Burge had opportunities to play abroad and as a replacement player in the WNBA, she chose not to pursue either option for personal (and entirely valid) reasons. Furthermore, despite the assertion in her brief that she was "terminated" by the Mystics, it is clear that her release was for "qualitative reasons" only, as her contract expressly permitted.

The decision of the Director affirming the ALJ's Compensation Order is therefore

*Affirmed.*