Keyuon M. HAMILTON, Appellant,

v.

HOJEIJ BRANDED FOOD, INC., Appellee.

No. 11–AA–332.

District of Columbia Court of Appeals.

Submitted March 27, 2012.

Decided April 12, 2012.

---

Jeffrey S. Gutman, filed a brief for ap-

pellant.*

Karl M. Terrell, filed a brief for appellee.

Before GLICKMAN and THOMPSON, Associate Judges, and SCHWELB, Senior Judge.

SCHWELB, Senior Judge:

On February 24, 2011, an Administrative Law Judge (ALJ) of the Office of Administrative Hearings (OAH) issued a Final Order affirming the denial by a Claims Examiner of the Department of Employment Services (DOES) of a claim by Keyuon M. Hamilton ("Ms. Hamilton" or "Claimant") for unemployment compensation benefits. Ms. Hamilton's request was based on her discharge on October 11, 2010, by Hojeij Branded Foods, Inc. ("Hojeij" or "Employer") for allegedly excessive absenteeism and tardiness. The ALJ held that Ms. Hamilton was disqualified from receiving unemployment compensation benefits on account of her "gross misconduct."

Ms. Hamilton has asked this court to review the ALJ's decision. She contends that the ALJ did not adequately consider, and in some cases did not address at all, circumstances which made her absences from work unavoidable, and that Hojeij has not demonstrated either "gross misconduct" or "simple misconduct" on her part.

Ms. Hamilton was an "at will" employee, and we do not suggest, in light of Ms. Hamilton's absences described below, that Hojeij lacked justification for discharging her. We agree with Ms. Hamilton, however, that as a matter of law, the record before the ALJ does not support a finding of gross misconduct, or, indeed, of any misconduct at all. Accordingly, we reverse the decision of the OAH and direct that Ms. Hamilton's claim for unemployment compensation benefits be granted.

## I

## THE PROCEEDINGS BEFORE THE ALJ

### A. *The ALJ's findings*

At the hearing before the ALJ, Ms. Hamilton testified on her own behalf and Boutros Khalil, Director of Operations, testified on behalf of the employer. The ALJ's findings of historical fact are reproduced verbatim in the paragraphs that follow:

> Claimant worked for Employer as an Assistant Restaurant Manager from August 2009, to October 11, 2010. Claimant was responsible for the overall management of the Cosi location at Dulles International Airport. Claimant made sure the restaurant was operated in accordance with COSI standards. Claimant was supervised by Ann Dunn, General Manager. Claimant supervised seven other employees. Claimant was also responsible for opening the restaurant to customers at 6:00 a.m. It was necessary for Claimant to arrive at the restaurant no later than 5:00 a.m.

> Prior to May 2010, the restaurant opened at 6:30 a.m., but Employer requested, and was granted approval by the Airport Authority, to open thirty minutes earlier to capture additional revenue during the breakfast rush. Employer determined that between 6:15 a.m. and 6:45 a.m. they [sic] could generate revenue in the amount of $600–$800 a day. Employer, under its lease agreement, was required to open its restaurant every day during the designated hours. In the event that the restaurant

---

*McKayle L. Davison and Richard W. Hagner, law student counsel, George Washington University Law School Legal Clinic, were also on the brief for appellant.

was not opened during the designated hours of operation, Employer could be penalized $100 a day by the airport authority or lose its lease.

Employer has an attendance policy in its Employee Handbook that established that

Failure to report to work for a scheduled shift is an unexcused absence.

Not having a ride, not having a clean uniform, oversleeping, failure to read the schedule correctly, etc. are not excused absences.

"Calling in sick" does not automatically excuse your absence. You must really be sick. It is the managers [sic] prerogative to require a doctor's note to excuse the absence. Employees who call in sick frequently will be required to bring a doctor's note.

Employees out for 3 days or more will be required to have a doctor's release to return to work.

If you need to be off unexpectedly—for any reason—it is your responsibility to find someone to cover for you.

Employee will be terminated on the third unexcused absence.

Claimant was provided with a copy of the employee handbook during orientation.

On June 11, 2010, Claimant called in sick and indicated that she had a neck sprain and a migraine. Claimant did not provide a doctor's note. *Id.* Claimant called in four hours in advance of her scheduled work.

On July 10, 2010, Claimant called in and indicated that she would be absent because her teenage daughter had gone into labor.

On July 20, 2010, Claimant left her shift early because her brother was rushed to the hospital with heart problems. She left to be with her brother.

On July 21–23, 2010, Claimant called in to report that she would be absent because her brother was undergoing surgery and all the rest of her family members were gathered at the hospital.

On August 7, 2010, Claimant called in absent due to a personal matter.

On August 30–31, Claimant called in absent due to illness.

On September 22, 2010, Claimant's supervisor, Ann Dunn, presented Claimant with a Development Plan. The purpose of the plan was to identify areas where Claimant needed improvement. The first area identified for improvement was attendance. The comment (under attendance) stated:

Within 1 year, you have called off 12 times. As a salaried manager you are required to work 50 hours each week. As a leader in this organization you must set the example and report to work on time for every shift you are scheduled. When you are absent it places a huge strain on the operation. Our expectation is that you are the leading and exemplary example however, you cannot enforce the company policy if you are not also compliant.

Claimant signed the Development Plan. On October 7–8, 2010, Claimant called out absent due to a personal issue, *i.e.*, contractors working in her apartment unit and building.

On October 11, 2010, Claimant was scheduled to work and open the restaurant. Claimant is one of five individuals with security access and a security key to open the store. Claimant did not arrive at the restaurant at 5:00 a.m. None of the other individuals with access were scheduled to be at the restaurant on October 11, 2010. Four other employees showed up to work their shifts that day but were unable to gain access to the restaurant.

Shortly after 8:00 a.m., Ann Dunn, General Manager, called Boutros Khalil, Director of Operations, and informed him that the Cosi Dulles restaurant was not open. Claimant arrived for work at 8:20 a.m. and opened the restaurant. As a result of Claimant's late arrival, Employer was responsible for paying the four other employees for their time on October 11, 2010. Employer lost revenue in the approximate amount of $600–$800.

On October 11, 2010, Employer terminated Claimant's employment for excessive absences and tardiness in violation of the attendance policy.

## B. *Ms. Hamilton's account*

Ms. Hamilton's version of the events that led to her discharge is effectively capsulized as follows in her counsel's brief to this court:

> As explained below, from June through September 2010, Ms. Hamilton was unable to go to work on several occasions as a result of her own health conditions, and those of immediate relatives. Ms. Hamilton provided her employer documentation from health care providers to support the stated reasons for her absences whenever possible. Moreover, Ms. Hamilton always called to let her employer know that she would be unable to work, and ensured that her shifts were covered by another employee. Until September 22, 2010, Hojeij did not express any concern about these absences.

With respect to the specific incidents summarized in the ALJ's findings, Ms. Hamilton provided the following elaboration:

*June 11, 2010*

According to Ms. Hamilton, she was absent on June 9, 2010, due to a neck sprain and a migraine headache. She testified that she called the employer in advance, and that her shift was covered by another employee. The ALJ made no finding as to whether the shift was covered or as to whether she credited Ms. Hamilton's uncontradicted explanation of her absence.

*July 10, 2010*

Ms. Hamilton, a single parent, testified that on the date in question, her 16–year-old daughter had a medical issue with her pregnancy, and that she (Ms. Hamilton) called her supervisor, General Manager Ann Dunn, on the day before to explain that she would be unable to come to work. According to Ms. Hamilton, Ms. Dunn directed her to have the shift covered, and Ms. Hamilton did so. Upon her return to work, Ms. Hamilton provided Ms. Dunn with the relevant documentation from the hospital. The ALJ made no findings as to any of these circumstances.

*July 21–23, 2010*

According to Ms. Hamilton, she was absent from work on these days because her brother had a "massive heart attack."[1] She testified that Ms. Dunn, the general manager, arranged for another employee to drive Ms. Hamilton to the hospital because, as one of her colleagues told Ms. Dunn, my nerves [were] so broken down that I couldn't really focus on anything. Ms. Dunn sent word to Ms. Hamilton to let her know if she needed additional time off; evidently, Ms. Hamilton's supervisor did not then regard her absence in order to be with her critically ill brother as "misconduct." Ms. Hamilton testified that her shifts were covered on the days that she was absent, and she provided documenta-

---

1. In a letter to Mr. Khalil, Ms. Hamilton disclosed that according to her mother, there was doubt at the outset as to whether her brother would "make it," *i.e.,* survive.

tion from the hospital on her return to work. The ALJ made no findings as to the circumstances described by Ms. Hamilton or the arrangement made by the employer on her behalf.

*August 7, 2010*

Ms. Hamilton testified that on this date, she was absent from work because her daughter had further difficulties with her pregnancy. She claimed that she had the shift covered, and she again provided documentation from the hospital when she returned to work. The ALJ found only that "Claimant called in absent due to a personal matter."

*August 29–30, 2010*

Ms. Hamilton testified that on these dates, she missed work "due to a stomach virus." A doctor advised Ms. Hamilton not to return to work for 48 hours. Once again, according to Ms. Hamilton, she arranged for another employee to cover her shift, and she provided a doctor's note upon her return. The ALJ found that Ms. Hamilton "called in absent due to illness," but made no findings as to Ms. Hamilton's remedial efforts or regarding the doctor's note.

*September 22, 2010*

As indicated in the ALJ's findings, Ms. Dunn presented Ms. Hamilton with a "Development Plan" focused on the need for Ms. Hamilton to improve her attendance record in order to set an example for the employees whom Ms. Hamilton supervised. Ms. Hamilton testified that this was the first notification that she received that her employer was concerned about her attendance.[2] The ALJ made no finding with regard to the correctness of this testimony.

**2.** During the course of her testimony, however, Ms. Hamilton did volunteer that on one of the occasions when she took her daughter to

*October 7–8, 2010*

Ms. Hamilton testified that on those days, her landlord required her to be in the apartment that she shared with her minor daughter and her newborn grandchild in order to supervise workers who were making emergency repairs of water and mold damage caused by flooding. Ms. Hamilton explained that because her daughter and granddaughter were minors, the landlord did not permit them to remain in the apartment while the repairs were being made. Ms. Hamilton notified Ms. Dunn that she would be absent from work, she covered her shifts, and she provided documentation from her landlord stating that an adult needed to be present in the apartment. The ALJ found that Ms. Hamilton "called out absent due to a personal issue, *i.e.,* contractors working in her apartment and building," but she made no findings regarding Ms. Hamilton's uncontradicted testimony that there was a serious emergency situation for her family.

*October 11, 2010*

This was the date on which Ms. Hamilton was discharged. Her version of the events of that day is summarized in her counsel's brief in this court as follows:

On October 11, 2010, Ms. Hamilton was scheduled to open the Dulles store at 6:00 a.m., which required her to arrive at the store by 5:00 a.m. On her way to work, shortly after 4:00 a.m., her car tire blew out on the Dulles Toll Road. Ms. Hamilton tried unsuccessfully to repair the tire herself and called family members to assist her, but she was unable to reach anyone. While waiting for help, Ms. Hamilton called other employees at the store. Before 5:00 a.m., she called Efraim, a shift leader with the ability to open the store, but got no answer and

the hospital, she arranged for someone to cover her shift, but that she "received a write-up the next day anyway."

left him a message. She also called Mohammed and Jose, two employees who were scheduled to work that morning. She spoke to them and let them know about her tire blowout but, without keys, they were unable to open the store for business on their own.

Ms. Hamilton also called Ms. Dunn before 5:00 a.m., but the call went straight to voicemail. Ms. Hamilton later learned that Ms. Dunn's phone was turned off and she [Ms. Dunn] did not attempt to retrieve her calls until after 9:00 a.m. Meanwhile, Mohammed called another assistant manager who also attempted to contact Ms. Dunn with no success. That assistant manager left a message for Ms. Dunn informing her of Ms. Hamilton's situation, but confirmed that Ms. Dunn's phone was off. The employer offered no evidence or testimony disputing that Ms. Hamilton made numerous efforts to contact her colleagues.

At about 7:00 a.m., another driver stopped to help Ms. Hamilton change her tire. Ms. Hamilton again called Jose and Mohammed to inform them of her status. Once the tire was fixed, Ms. Hamilton drove straight to work and arrived at the store around 8:15 a.m. She testified that this was the only time she ever opened the store late. Later that day, October 11, 2010, Ms. Hamilton received a termination letter from Boutros Khalil, Director of Operations for Hojeij Branded Food.

The ALJ found that Ms. Hamilton "arrived at work at 8:20 a.m. and opened the restaurant." The ALJ did not address at all the circumstances that led to Ms. Hamilton's late arrival, nor did the ALJ mention Ms. Hamilton's uncontradicted testimony that she had a flat tire on the Dulles Toll Road about 4:00 a.m., and that she made numerous telephone calls to bring the problem to the employer's attention.

C. *The ALJ's decision*

In her order, the ALJ discussed her understanding of the applicable legal principles in some detail, and she then summarized her conclusions as follows:

I conclude that, in this case, Employer has satisfied its burden to prove that Claimant's repeated absenteeism constituted gross misconduct because it "deliberately or willfully violat[ed] the employer's rules, deliberately or willfully threaten[ed] or violat[ed] the employer's interests, show[ed] a repeated disregard for the employee's obligation to the employer, or disregard[ed] standards of behavior which an employer has a right to expect of its employee." 7 DCMR 312.3. Specifically, I consider the following:

(1) Claimant's pattern of absenteeism and tardiness extended over a period of at least 6 months, during which she received at least one Development Plan. The plan specifically placed Claimant on notice that her behavior of being absent was detrimental to the operation of the Employer and unacceptable behavior for a manager.

(2) Claimant's acts had serious consequences for Employer. On the day Claimant arrived to work three hours and twenty minutes late, Employer was obligated to pay four employees for their time even thought they were unable to gain access to the restaurant and perform services. Employer also suffered a loss of approximately $600–$800 in revenue that was not realized during the normal breakfast rush. In addition, Employer had reason to believe that continued toleration of Claimant's behavior could jeopardize its contract with the airport authority.

(3) Claimant's pattern of absences and tardiness displays the elements of

willfulness and deliberation required for gross misconduct. Not only was Claimant frequently absent, on her last day of employment she arrived three hours and twenty minutes late, but did not contact anyone in management directly until 8:00 a.m. or later. While Claimant appeared at the hearing and offered explanations for her absences, the majority of Claimant's absences related to her decision to support her family members, *i.e.,* her daughter's pregnancy and her brother's illness. On one occasion Claimant missed two days of work while repairs were being made in her apartment building and unit. I conclude that Employer proved the pattern of behavior required for a prima facie case of gross misconduct.

Opining that Ms. Hamilton had failed to rebut the employer's *prima facie* case, the ALJ held that Ms. Hamilton was disqualified from receiving unemployment compensation benefits.

## II

### APPLICABLE LEGAL PRINCIPLES

#### A. *Standard of review*

 "Under the District of Columbia Administrative Procedure Act (DCAPA), we must sustain the decision of the [OAH] unless it is unsupported by substantial evidence in the record." *Washington Times v. District of Columbia Dep't of Emp't Servs.,* 724 A.2d 1212, 1220 (D.C.1999) (citation omitted). We articulated the standard of review in *Larry v. Nat'l Rehab. Hosp.,* 973 A.2d 180, 182–83 (D.C.2009), as follows:

> We review OAH decisions to determine whether "(1) OAH made findings of fact on each materially contested issue of fact, (2) substantial evidence supports each finding, and (3) OAH's conclusions flow rationally from its findings of fact."

*Rodriguez v. Filene's Basement Inc.,* 905 A.2d 177, 180–81 (D.C.2006) (citations omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 181 (internal quotations and citation omitted). In addition, and importantly here, "OAH's finding of misconduct must be based fundamentally on the reasons specified by the employer for the discharge." *Hegwood v. Chinatown CVS, Inc.,* 954 A.2d 410, 412 (D.C.2008) (internal quotations and citation omitted).

 The dispositive issue in this case, namely, "[w]hether [Ms. Hamilton's] actions constituted misconduct, gross or simple," is one of law, and our review of the ALJ's resolution of this issue is therefore *de novo. Odeniran v. Hanley Wood,* 985 A.2d 421, 424 (D.C.2009) (citations omitted); *see also Badawi v. Hawk One Sec., Inc.,* 21 A.3d 607, 613 (D.C.2011). Fundamentally, it is the court's responsibility, in reviewing the OAH's decision, "to assure that the [OAH] has taken a 'hard look' at the issues in the case." *Washington Times,* 724 A.2d at 1221 (citations omitted); *see Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). In other words, "the function of the court in reviewing administrative action is to assure that the agency has given full and reasoned consideration *to all material facts and issues.* The court can only perform this function when the agency discloses the basis of its order by an articulation with reasonable clarity of its reasons for the decision." *Dietrich v. District of Columbia Bd. of Zoning Adjustment,* 293 A.2d 470, 473 (D.C.1972) (emphasis added); *see also Washington Times,* 724 A.2d at 1221 (quoting *Dietrich* ).

■ "It is incumbent upon us, in this case as in any other, to eschew appellate fact-finding." *V.C.B. v. United States*, 37 A.3d 286, 291 (D.C.2012) (quoting *Brown v. United States*, 590 A.2d 1008, 1020 (D.C. 1990)). There is, however, "a rebuttable presumption that each witness, including [a] part[y], has sworn to the truth." *Belcon, Inc. v. District of Columbia Water & Sewer Auth.*, 826 A.2d 380, 386 (D.C.2003) (citations omitted). Moreover, "[t]he foregoing rebuttable presumption applies with greater force when the witness' testimony is uncontradicted." *Id.* "Ordinarily, positive testimony which is not inherently improbable, inconsistent, contradicted, or discredited *cannot be disregarded or ignored by judge or jury*," *Perlman v. Chal–Bro., Inc.*, 43 A.2d 755, 756 (D.C.1945) (emphasis added) (citing *Stone v. Stone*, 78 U.S.App. D.C. 5, 8, 136 F.2d 761, 764 (1943)), or, for that matter, by any trier of fact. *See* 32A C.J.S. Evidence § 1329 (1996). In *Chesapeake & Ohio Ry. Co. v. Martin*, 283 U.S. 209, 216, 51 S.Ct. 453, 75 L.Ed. 983 (1931), the Supreme Court explained:

> We recognize the general rule, of course, as stated by both courts below, that the question of the credibility of witnesses is one for the jury alone; but this does not mean that the jury is at liberty, under the guise of passing upon the credibility of a witness, to disregard his testimony, when from no reasonable point of view is it open to doubt. The complete testimony of the agent in this case appears in the record. A reading of it discloses no lack of candor on his part. It was not shaken by cross-examination; indeed, upon this point, there was no cross-examination. Its accuracy was not controverted by proof or circumstance, directly or inferentially; and it is difficult to see why, if inaccurate, it readily could not have been shown to be so. The witness was not impeached; and there is

nothing in the record which reflects unfavorably upon his credibility.

This passage must, of course, be read with the caveat that even uncontradicted testimony need not and should not be credited if the witness comes across to the trier of fact as a liar or charlatan, or as having a deficient and unreliable memory, but no such consideration applies here. "Where men [or women] of reason and fairness may entertain differing views as to the truth of the testimony, whether it be uncontradicted, uncontroverted or even undisputed, evidence of such a character is for the [trier of fact]." *Ferdinand v. Agricultural Ins. Co.*, 22 N.J. 482, 126 A.2d 323, 329 (N.J.1956).

*See also Belcon*, 826 A.2d at 386 n. 9 (quoting the foregoing passage).

B. *The unemployment compensation statute*

■ The District's unemployment compensation law is set forth in D.C.Code §§ 51–109 *et seq.* (2001 & Supp.2011). Briefly, the statute creates a right to unemployment compensation benefits, but an employee may be disqualified from receiving benefits if he or she was discharged for misconduct, either "gross" or "other than gross," *id.* § 51–110(b), the latter category being commonly known as "simple" misconduct. *Larry*, 973 A.2d at 182. The employer has the burden of proving misconduct, and misconduct shall not be presumed. *Washington Times*, 724 A.2d at 1218 (citing 7 DCMR §§ 312.2, 312.8); *Keep v. District of Columbia Dep't of Emp't Servs.*, 461 A.2d 461, 463 (D.C.1983) (per curiam).

■ The purpose of the unemployment compensation statute is to "protect against economic dependency caused by temporary unemployment and to reduce the need for other welfare programs." *Hickey*

v. *Bomers,* 28 A.3d 1119, 1126 (D.C.2011) (quoting *Bowman–Cook v. Washington Metro. Area Transit Auth.,* 16 A.3d 130, 134 (D.C.2011)). "The statute is remedial humanitarian legislation of vast import, and its provisions must be liberally and broadly construed." *Washington Times,* 724 A.2d at 1216–17 (internal citation and quotation marks omitted) (quoting *Cruz v. District of Columbia Dep't of Emp't Servs.,* 633 A.2d 66, 69 (D.C.1993)); *see also Hickey,* 28 A.3d at 1126 (unemployment compensation law is to be "liberally construed to accomplish its purpose and extend its coverage, with a consequent strict construction of exemption provisions" (quoting *Brannum v. District of Columbia Pub. Sch.,* 946 A.2d 962, 966 (D.C.2008) (internal citation and brackets omitted))). "Remedial statutes are liberally construed to suppress the evil and advance the remedy," *Riggs Nat'l Bank v. District of Columbia,* 581 A.2d 1229, 1234 (D.C.1990) (quoting 3 N. SINGER, SUTHERLAND, STATUTORY CONSTRUCTION § 60.01, at 55 (4th ed. 1986)), and we must construe our unemployment compensation law accordingly.

In light of the foregoing principles, "[t]he fact that an employee's discharge appears reasonable from the employer's perspective does not necessarily mean that the employee engaged in misconduct." *Washington Times,* 724 A.2d at 1218 (citing *Cruz,* 633 A.2d at 69). Hojeij might reasonably have believed, in light of Ms. Hamilton's absences, that it would be to its economic advantage to replace her, but such a belief would not automatically warrant the denial of unemployment compensation benefits. Proof by the employer that the employee was fired for misconduct, either "gross" or "simple," was required.

## C. Misconduct

To determine whether the employer satisfied its burden of showing that Ms. Hamilton engaged in misconduct, gross or simple, warranting the denial of benefits, we must consider the ordinary import of the term. When statutory language is unambiguous, we are required to give effect to its plain meaning. *J. Parreco & Son v. District of Columbia Rental Hous. Comm'n,* 567 A.2d 43, 45 (D.C.1989). "The words used [in the statute], even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting [its] meaning." *Id.* at 46 (quoting *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.1945) (per Learned Hand, J.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945)). Although "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary, it is useful to have one around." *Riggs,* 581 A.2d at 1234 (citing *Parreco,* 567 A.2d at 46); *see also Simpson v. District of Columbia Office of Human Rights,* 597 A.2d 392, 399 (D.C.1991).

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, 1943 (Merriam–Webster's 2002) defines "misconduct," in pertinent part, as "intentional wrongdoing: deliberate violation of a rule of law or standard of behavior." The dictionary definition of "misconduct" thus at least implicitly excludes accidental or unintentional acts or omissions.

Our construction of the word "misconduct," in interpreting District's unemployment compensation statute, has been generally consistent with the ordinary meaning of the word. We have repeatedly made it clear that

[n]ot every act for which an employee may be dismissed from work will provide a basis for disqualification from unemployment compensation benefits because of misconduct; such disqualifying

misconduct must meet a higher standard for

> it must be an act of wanton or wilful disregard of employer's interest, deliberate violation of employer's rules, disregard of standards of behavior which employer has right to expect of his employee, or negligence in such decree or recurrence as to manifest culpability, wrongful intent or evil design, or show intentional and substantial disregard of employer's interest or of employee's duties and obligations to employer.

*Hawkins v. District Unemployment Comp. Bd.*, 381 A.2d 619, 622 (D.C.1977) (per curiam) (quoting *Hickenbottom v. District of Columbia Unemployment Comp. Bd.*, 273 A.2d 475, 477–78 (D.C. 1971)) (quoting 48 AM.JUR. Social Security; Unemployment Insurance § 38 (1943)); *see also Capitol Entertainment Servs. v. McCormick*, 25 A.3d 19, 27, (D.C.2011) (quoting *Hickenbottom*). More recently we have observed that "implicit in the definition of 'misconduct' is that the employee intentionally disregarded the employer's expectations of performance," *Bowman–Cook*, 16 A.3d at 135 (emphasis added) (citation and internal quotation marks omitted); *see also Hickey*, 28 A.3d at 1129, and we have drawn the logical inference that "a finding that the employee's conduct was intentional may be required even for a finding of simple misconduct." *Hickey*, 28 A.3d at 1129 (citation and internal quotation marks omitted). Consistently with these precedents, we have held that "ordinary negligence does not rise to the level of misconduct, gross or otherwise, under the District's unemploy-

ment compensation law." *Capitol Entertainment*, 25 A.3d at 21.

**D.** *Gross misconduct and simple misconduct*

▮ Although this court has consistently adhered to the foregoing understanding of "misconduct" for many years and continues to do so today, our law now formally recognizes two kinds of misconduct:

> Since 1993, the applicable ·statute has distinguished between "gross misconduct" and "misconduct, other than gross misconduct." For convenience we have referred to the latter as "simple misconduct." A discharge for gross misconduct carries a more severe penalty and more demanding requirements for regaining eligibility for benefits than does a discharge for simple misconduct.

> The statute does not define the terms "misconduct," "gross misconduct," or "other than gross misconduct." Instead, it directs the District of Columba Unemployment Compensation Board to "add to its rules and regulations specific examples of behavior that constitute misconduct within the meaning of this subsection." The Board has adopted regulations that define gross and simple misconduct with examples of each.

> The regulations state that the term "gross misconduct" means

> an act which deliberately or willfully violates the employer's rules, deliberately or willfully threatens or violates the employer's interests, shows a repeated disregard for the employee's obligation to the employer, or disregards standards of behavior which an employer has a right to expect of its employee.[3]

---

**3.** The regulation provides the following nonexclusive illustrations of gross misconduct:
 (a) Sabotage
 (b) Unprovoked assault or threats
 (c) Arson
 (d) Theft or attempted theft
 (e) Dishonesty
 (f) Insubordination

"Other than gross misconduct" is defined more broadly to mean "an act or omission by an employee which constitutes a breach of the employee's duties or obligations to the employer, a breach of the employment agreement or contract, or which adversely affects a material employer interest." The term encompasses "those acts where the severity, degree, or other mitigating circumstances do not support a finding of gross misconduct."[4]

*Capitol Entertainment,* 25 A.3d at 22–23 (footnotes omitted).

### E. Absenteeism and tardiness

■ "Attendance at work is an obligation which every employee owes to his or her employer, and poor attendance, especially after one or more warnings, constitutes misconduct sufficient to justify the denial of a claim for unemployment benefits." *Shepherd v. District of Columbia Dep't of Emp't Servs.,* 514 A.2d 1184, 1186 (D.C.1986). "[R]epeated absence or tardiness following warning" is one of the illustrations of gross misconduct enumerated in the regulations. 7 DCMR § 312.4; *see* note 3, *supra.* So, too, less frequent or less serious absenteeism is listed as an example of simple misconduct. 7 DCMR § 312.6.

■ But, being absent from work—even frequently absent—does not necessarily constitute gross misconduct, or indeed, misconduct at all. In recognizing, in *Larry,* 973 A.2d at 184, the common sense principle that "[c]learly, employers have a reason to discharge an employee who does not regularly show up for work," we went on to explain that "whether the employee was discharged for 'gross misconduct' is a distinct issue which depends on the underlying reasons for the absences." *Id.; see also Benjamin v. Washington Hosp. Ctr.,* 6 A.3d 263, 268 (D.C.2010). The court added in *Larry* that the petitioner, who had failed for medical reasons to come to work on the day that she was discharged, may have "acted 'deliberately' in the sense that she deliberately did not go to work on that day, *but it stretches any reasonable definition of that word as used in the regulation to think that a* seriously ill person would be expected to show up for hospital duty." *Id.* at 183 (emphasis added). Although, in *Larry,* "simple" misconduct was not discussed in the briefs or by the OAH, and the court explicitly declined to address it, 973 A.2d at 184 n. 5, we conclude that intentionality or its equivalent (*e.g.,* conscious indifference to, or reckless disregard of, the employee's obligations or the employer's interest) is an element of misconduct of any kind, and that the court's reasoning in *Larry,* namely, that whether absenteeism constitutes gross misconduct depends on the reasons for the employee's absences, applies by analogy to claims of simple misconduct as well. In other words, if an employee has a broken leg, or if his or her child has been in a serious accident, or if his or her house

---

(g) Repeated disregard of reasonable orders
(h) Intoxication, the use of or impairment by an alcoholic beverage, controlled substance, or other intoxicant
(i) Use or possession of a controlled substance
(j) Willful destruction of property
(k) Repeated absence or tardiness following warning
7 DCMR § 312.4.

4. Other than gross misconduct may include:

(a) Minor violations of employer rules
(b) Conducting unauthorized personal activities during business hours
(c) Absence or tardiness where the number of instances or their proximity in time does not rise to the level of gross misconduct
(d) Inappropriate use of profane or abusive language
7 DCMR § 312.6.

has been set on fire, and if he or she duly notifies the employer of the problem in a timely fashion, then failure to appear for work, even repeated failure, does not constitute misconduct. An employee's illness is an unfortunate and involuntary event, which is ordinarily unavoidable, and standing alone, unintentional absence from work on account of illness is not misconduct. *See Morris v. United States Envtl. Prot. Agency,* 975 A.2d 176, 184 (D.C.2009); *Hickey,* 28 A.3d at 1129. So, too, the courts of "several states have held that excessive absences, where justified by illness or family emergency and properly reported to the employer, are not willful misconduct." *Garden View Care Ctr., Inc. v. Labor & Indus. Relations Comm'n of Mo.,* 848 S.W.2d 603, 606 (Mo.Ct.App.1993) (citations omitted). Even repeated absences or tardiness caused by illness do not constitute gross misconduct or, in our view, simple misconduct, unless the employee acted intentionally or in disregard of his or her obligation or expected standards of behavior, although the frequency of such absences may be relevant to whether they were intentional or should have been avoided. *Morris,* 975 A.2d at 182.

## III

### THE LEGAL PRINCIPLES APPLIED

 It was the ALJ's responsibility, in evaluating the evidence in this case, to give "full and reasoned consideration to *all material facts and issues.*" *Washington Times,* 724 A.2d at 1221 (emphasis added) (citation omitted). We conclude that in this case, the ALJ failed to include adequately in her calculus Ms. Hamilton's uncontradicted testimony, and the documentary evidence supporting that testimony, relating to the circumstances of her absences and single tardiness, and that her order therefore cannot stand.

### A. The events of October 11, 2010

Ms. Hamilton was fired on October 11, 2010, the day that she arrived at the Cosi Dulles restaurant more than three hours late. Because this was the precipitating event for her discharge—at the very least, it was the straw that broke the camel's back—it must be a principal focus of our inquiry. *See Larry,* 973 A.2d at 184.

The ALJ found, and the evidence shows, that Ms. Hamilton's late arrival was quite costly to the employer, which had to pay employees for work while the restaurant was closed and which undoubtedly lost revenue. The ALJ apparently inferred from Ms. Hamilton's lateness, as well as from her prior absences from work and the then-recent warning and Development Plan that she had received, that Ms. Hamilton's belated arrival was willful. In drawing this inference, however, the ALJ essentially disregarded Ms. Hamilton's uncontradicted testimony as to what occurred on that morning. Indeed, there is no mention at all in the ALJ's order of the event that evidently precipitated Ms. Hamilton's late arrival, namely, a blow-out on the Dulles Toll Road shortly after 4:00 a.m.

According to Ms. Hamilton, she suffered this flat tire en route to what would otherwise have been a timely arrival at the restaurant. Ms. Hamilton testified that before 5:00 a.m., she tried to call her supervisor, Ms. Dunn, but that Ms. Dunn's telephone was turned off. As we have noted, Ms. Hamilton also testified that she made a number of telephone calls to other employees and to family members, but that she was unable to contact anyone who could open the restaurant.

The employer did not call Ms. Dunn, or, indeed, any other witness, to contradict Ms. Hamilton's account of these events. The employer's brief in this court is like-

wise bereft of any basis for finding that Ms. Hamilton's lateness was not due to her unexpected and undoubtedly frightening flat tire in the early hours of the morning. Nevertheless, the ALJ's entire description of this event consisted of a statement that "on her last day of employment [Ms. Hamilton] arrived three hours and twenty minutes late, but did not contact anyone in management directly until 8:00 a.m. or later." The ALJ ignored entirely the uncontested testimony, corroborated by another employee, that Ms. Dunn's cell phone was on voicemail until 9:00 a.m., so that Ms. Hamilton could not reach her.

Given this state of the record, we are unable to discern any basis for the ALJ's conclusion that Ms. Hamilton's failure to be at work on time on October 11 was intentional or the result of misconduct, gross or otherwise. In light of the humanitarian purposes of the unemployment compensation statute, the denial of benefits to an employee for a late arrival which resulted from a flat tire shortly after 4:00 a.m., en route to work, when the employee testified without contradiction that she made extensive efforts to bring the problem to the employer's attention, appears to us to be altogether unwarranted.

### B. *Earlier absences*

Ms. Hamilton's tardiness on the morning of her discharge does not, however, stand alone in the record. Much of the ALJ's order, and much of Ms. Hamilton's testimony, addressed her various absences

from work. The ALJ's conclusion that Ms. Hamilton had engaged in gross misconduct was based in substantial part on her failure to come to work as a result of illness in the family—her own or her daughter's or brother's—and when there was an emergency at her residence. Although Ms. Hamilton contends that only events after the October 7 warning are relevant, we disagree, first because the past is prologue and often explains the present, and second because the question whether Ms. Hamilton engaged in misconduct turns on a fair assessment of all of her employer's complaints against her.[5]

Turning to the absences attributable to her own or family illness, we note that although the employer's handbook provided that employees would be terminated after three unexcused absences, Boutros Khalil, the employer's director of operations, testified that an employee's illness, or a serious medical condition of an employee's child or children would, if properly documented, excuse the employee's absences. Ms. Hamilton stated without contradiction that on the three occasions that she was ill—June 9, August 29–30, and September 2–4—she notified the employer in advance, and that she arranged for another employee to take her shift. On the latter two occasions, she provided either a hospital record or a doctor's note upon her return to work. Ms. Hamilton testified that she suffers from migraine headaches, and no testimony was intro-

---

5. Ms. Hamilton asks us to consider only events after October 7 because, according to her counsel, "[t]he regulation defining gross misconduct due to absenteeism requires repeated absences or tardiness following warnings." But as we observed in *Hickey,* 28 A.3d at 1129, the fact that absences or tardiness are repeated may be relevant to the employee's state of mind. Moreover, even if we were to assume, *arguendo,* that only post-warning absences or lateness can constitute miscon-

duct, earlier happenings nevertheless have the potential to shed light on subsequent events which are our primary focus. "Testimony of prior or subsequent transactions, which for some reason are barred from forming the basis of a suit, may nevertheless be introduced if it tends reasonably to show the purpose and character of the particular transactions under scrutiny," *Fed. Trade Comm'n v. Cement Inst.,* 333 U.S. 683 705, 68 S.Ct. 793, 92 L.Ed. 1010 (1948).

duced by the employer to support any theory that Ms. Hamilton was malingering or exaggerating her symptoms.[6]

Ms. Hamilton testified that her sixteen-year-old daughter was pregnant. Two of Ms. Hamilton's absences—July 10 and August 7—were due to problems with her daughter's pregnancy which necessitated visits to the hospital.[7] In each case, Ms. Hamilton provided documentation from the hospital. From September 2–4, Ms. Hamilton was absent because her daughter gave birth to a baby on September 3 (an event which apparently coincided with one of Ms. Hamilton's migraines). Ms. Hamilton again brought documentation from the hospital, and she arranged for her shifts to be covered—evidence which the ALJ did not address. Given her young daughter's difficult pregnancy, it is difficult to discern what Ms. Hamilton could or should have done differently, or how her actions in the situation confronting her constituted misconduct, gross or otherwise.

Ms. Hamilton's most extended absence involved the hospitalization of her brother. Ms. Hamilton testified that the brother suffered a "massive heart attack," which apparently endangered his life and required major surgery. For three days in July, Ms. Hamilton, along with the rest of the family, was at his bedside. The ALJ's brief account of this episode in her findings arguably gives the impression that Ms. Hamilton was at the hospital, in preference to going to work, primarily because her relatives were there. The ALJ made no mention, however, of Ms. Hamilton's testimony that her supervisors arranged for Ms. Hamilton's transportation to the hospital and inquired whether she (Ms. Hamilton) needed additional time off. Given the foregoing, it is somewhat incongruous for the employer to claim, and for the ALJ to find, that Ms. Hamilton—who in this case, as in others, provided documentation from the hospital—engaged in misconduct by doing what she was invited to do, and by being with her brother during a very serious and frightening illness. In her findings, the ALJ made no mention at all of management's role in arranging transportation and offering Ms. Hamilton additional time off.[8]

Ms. Hamilton's final alleged transgression occurred shortly after she received the Development Plan, when emergency flood repairs were being made to her apartment. The ALJ summarized this incident as follows: "On October 7–8, 2010, claimant called out absent to a personal issue, i.e., contractors working in her apartment unit and building." The ALJ made no mention, however, of Ms. Hamilton's testimony, which revealed that the

6. The ALJ found that on the first of these occasions "Claimant did not provide a doctor's note." In this instance, Ms. Hamilton testified that she had a migraine and a neck sprain, and she apparently did not see a doctor. On the occasions when Ms. Hamilton did provide a hospital record or doctor's note, the ALJ's findings do not include any mention of this. The ALJ likewise made no reference to Ms. Hamilton's compliance in each case with the employer's rule that "[i]f you need to be off unexpectedly—for any reason—it is your responsibility to find someone to cover for you."

7. The ALJ found, somewhat cryptically, that "Claimant called in absent due to a personal matter."

8. In its brief in this court the employer argues that in choosing to be at the hospital, Ms. Hamilton unreasonably "decided to ignore, or at least significantly devalue the important 'obligation' of attendance at work which this [c]ourt has recognized." This contention is difficult to reconcile with the employer's written policy as to family illness, and it ignores the gravity of the brother's condition, as well as the employer's apparently understanding reaction to the problem at the time.

matter was not quite as simple as that. Ms. Hamilton was occupying the unit with a sixteen-year-old daughter (who had given birth just over a month earlier) and her month-old granddaughter. She offered documentation showing that, because her daughter was a minor, the landlord required her presence while repairs were being made. As her counsel argues persuasively in this court,

> Ms. Hamilton testified that she received a letter from her landlord on October 5, 2010, notifying her that she was required to be in her apartment on October 7 and 8, 2010, while maintenance workers repaired water damage caused by flooding and treated the apartment for the resulting mold. The danger of this mold, and need for emergency intervention, was exacerbated by the presence of her teenage daughter and infant granddaughter in the apartment. It was not enough for Ms. Hamilton simply to let the workers in the apartment. Rather, the landlord required Ms. Hamilton to be present to supervise the work and to consent to the moving of furniture. Ms. Hamilton did not have anyone else to whom she could delegate this duty. Her daughter and granddaughter had to move out and, as minors, could not supervise the project. This absence should fall within the class of what is "sufficiently excusable" under *Larry*. Like illness, this type of incident is unpredictable and unavoidable. Major unplanned repair work which needs to be completed quickly because of health concerns should be considered sufficiently excusable to negate willfulness. Ms. Hamilton was simply trying to ensure that she and her young family had a safe and sanitary place to reside. With both the tire blowout and the apartment repair, Ms. Hamilton did not choose to be absent from the workplace. Unavoidable circumstances forced her to miss work.

■ Considering all of these incidents together, we can sympathize with the employer's frustration and its decision to terminate Ms. Hamilton's services. Perhaps, after her daughter became pregnant, a woman subject to frequent migraine headaches should have considered carefully whether she should continue to work on a job for which the hours were problematical and regular attendance was vital, especially since she was a supervisor. But according to the undisputed testimony, Ms. Hamilton did substantially all that she could do under the circumstances of each incident of absence or tardiness. We conclude that whether they are considered individually or together, Ms. Hamilton's absences and single late arrival cannot reasonably be viewed as misconduct, gross or simple, warranting denial of unemployment compensation benefits.

## IV

## THE REMAND

For the foregoing reasons, we conclude that the record does not support the ALJ's conclusion that Ms. Hamilton was discharged for gross misconduct, or, indeed, for any misconduct at all. The inference that Ms. Hamilton acted willfully is, in our view, unreasonable. A question nevertheless arises as to the appropriate remedy. Ms. Hamilton contends that we should reverse the decision of the OAH and order that Ms. Hamilton's request for unemployment compensation be granted, without further proceedings before the agency. A single credibility determination by the ALJ, however, makes the issue more difficult, and requires us to consider whether we should instead, remand to the OAH for additional findings of fact.

At the hearing before the ALJ, Ms. Hamilton was shown a copy of the employer's "Attendance Policy," and her counsel inquired whether she had ever seen the document during her employment with Hojeij. Ms. Hamilton testified that she had never seen, received, or signed the policy. The only copy of the Attendance Policy that was admitted into evidence or made a part of the record contains spaces for the signatures of the employee and of the manager. Both of these spaces are blank. The record contains no copy of the policy signed by Ms. Hamilton or by a representative of the employer.

In connection with this testimony, the ALJ made the following finding:

> Employer's witness, Boutros Khalil, Director of Operations, testified that Claimant was provided with an Employee Handbook during orientation. While Claimant denies ever receiving the handbook, I do not find her testimony credible. Claimant was an Assistant Manager with seven employees under her supervision; I find it disingenuous for her to testify that she "never" saw the attendance policy or knew what was expected of her or the employees under her supervision.

The transcript reflects that the ALJ's description of Ms. Hamilton's testimony is not altogether accurate. Ms. Hamilton did, indeed, state that she had not seen or signed the attendance policy, and there was no direct proof that she had. She did not, however, assert that she did not know "what was expected of her." On the contrary, her compliance with the employer's rule requiring documentation of medical visits, and her arrangements for other employees to take over her shifts, demonstrate that she was in fact aware of her obligations and took them quite seriously.

Moreover, although Mr. Khalil, the sole witness for the employer, testified that the attendance policy "is a part of the new hire paper work" and that "[e]very employee is informed about that,"[9] so that "all of [our] managers including Ms. Hamilton [were] aware that the store had to be opened on time," he was unable to recall whether he personally showed the policy to Ms. Hamilton, explaining that "she was hired before me in the company." Considering all of the relevant testimony, the ALJ's finding, in effect, that Ms. Hamilton had lied under oath appears somewhat harsh.

Nevertheless, the ALJ was present when Ms. Hamilton testified and she was in a position to assess the demeanor of the witness. We, on the other hand, are limited to a paper record which may well fail to capture "the heart and soul of the case." *See In re S.G.*, 581 A.2d 771, 774–75 (D.C. 1990); *Combs v. District of Columbia Dep't of Emp't Servs.*, 983 A.2d 1004, 1009 n. 3 (D.C.2009). We are therefore in no position to disregard the ALJ's credibility finding.

■■■ If a witness testifies untruthfully regarding one issue, it may not be unreasonable to infer that he or she was likewise less than candid with regard to other matters as well. Accordingly, although the ALJ made no mention of this common-sense proposition, and notwithstanding the failure of counsel for the employer to make any such argument in his brief, we think it appropriate to give serious consideration to whether the ALJ's credibility determination casts sufficient doubt on the reliability of Ms. Hamilton's remaining testimony to warrant a remand for further proceedings.

---

9. This testimony was in response to a question whether managers had been briefed "regarding opening and closing the store at a certain hour."

Upon due consideration, we answer that question in the negative. Although the scope of the ALJ's adverse credibility finding vis-a-vis Ms. Hamilton—"while claimant denies ever receiving the handbook, I do not find her testimony credible"—is not entirely clear,[10] we think that, given the context, it would be an unreasonable stretch to suppose that the ALJ was declaring Ms. Hamilton's testimony as a whole to be incredible. The ALJ's order contains no other reference to the credibility *vel non* of Ms. Hamilton's evidence, and the transcript contains nothing to suggest that Ms. Hamilton's explanations of her absences and tardiness were fabricated or untrue.[11] Indeed, as we have noted in our discussion of the record, Ms. Hamilton's testimony as to the circumstances of each incident stands essentially uncontradicted. The employer presented no version of events that differed from Ms. Hamilton's account, it called as witnesses no employees who had direct contact with Ms. Hamilton,[12] and it introduced no documentary evidence tending to show lack of candor on Ms. Hamilton's part.[13] Accordingly, we conclude that the record in this case requires that Ms. Hamilton's application for unemployment compensation benefits be granted forthwith, and that a remand for further proceedings is neither required nor appropriate. *See, e.g., Changkit v. District of Columbia Dep't of Emp't Servs.,* 994 A.2d 380, 390 (D.C.2010).

## V

## CONCLUSION

For the foregoing reasons, the decision of the OAH is reversed, and the case is remanded with directions to grant Ms. Hamilton's application for unemployment compensation benefits.

*So ordered.*

---

**10.** We note that the ALJ wrote *"her* testimony," rather than *"this* testimony," so that the sentence could conceivably be read more broadly to go beyond the testimony about the handbook to Ms. Hamilton's general credibility.

**11.** In connection with one of Ms. Hamilton's absences from work, her counsel attempted to introduce two documents from a doctor's office. One of these documents bore a stamp while the other did not. The ALJ declined to admit the unstamped document because "I'm not clear whether—I don't know whether that's a practice. So I do have some questions as to whether or not this is an authentic document." The ALJ made no reference to this event in her written order.

**12.** It was disclosed that Ms. Dunn, who was Ms. Hamilton's immediate supervisor, was in Europe at the time of the hearing, but there is no record of a request by the employer for a continuance on that account.

**13.** There was one apparent inconsistency in Ms. Hamilton's testimony. On September 22, 2010, she and Ann Dunn both signed the "Development Plan" which was presented to her by the employer as a result of her numerous absences. Subsequently, she refused to sign essentially the same document, after two more recent incidents had been added to it, "[b]ecause when we reviewed it most of it was not true." The ALJ made no mention of this apparent discrepancy in her Order, and there is no reference to it in the employer's brief.