*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-AA-1441

E.C.,[*] PETITIONER,

v.

RCM OF WASHINGTON, INC., RESPONDENT.

Petition for Review of a Decision of the
District of Columbia Office of Administrative Hearings
(2012-DOES-00933)

(Argued September 27, 2013                    Decided June 5, 2014)

*Jennifer Mezey*, Legal Aid Society of the District of Columbia, with whom *Drake Hagner* and *John C. Keeney, Jr.*, were on the brief, for petitioner.

*Joan S. Meier*, Domestic Violence Legal Empowerment and Appeals Project ("DV LEAP"), and George Washington University Law School, with whom *Matthew A. Eisenstein*, *Christa D. Forman,* and *Adele M.K. Gilpin*, Arnold & Porter, LLP, were on the brief, for *amici curiae*.

*Eugene A. Adams*, Chief Deputy Attorney General for the District of Columbia, with whom *Ariel B. Levinson-Waldman*, Senior Counsel to the Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, *Loren L. Alikhan*, Deputy Solicitor General, and *Richard S. Love*, Senior Assistant Attorney General, filed an *amicus curiae* brief for petitioner.

---

[*] Pursuant to petitioner's request, this court will use her initials, "E.C.," to refer to petitioner and those of her ex-boyfriend, "M.L.", when referencing him, in order to help protect their privacy.

Before BLACKBURNE-RIGSBY and EASTERLY, *Associate Judges*, and KING, *Senior Judge*.

BLACKBURNE-RIGSBY, *Associate Judge*:  In this appeal, we are presented with an issue of first impression:  whether a victim of domestic violence, who is separated from her employment on account of alleged misconduct, is nonetheless eligible for unemployment compensation benefits when the alleged misconduct underlying the victim's separation from employment is "due to domestic violence." In this case, petitioner E.C. seeks review of the decision by an administrative law judge ("ALJ") of the District of Columbia Office of Administrative Hearings ("OAH") partially denying her claim for unemployment benefits on the basis that she was terminated for simple misconduct.

On review, E.C., joined by *amici curiae* and the District of Columbia Office of the Attorney General ("the District"),[1] contends that the ALJ erred in his determination that she is disqualified from receiving unemployment compensation

---

[1]  We invited the District to provide us with supplemental briefing on October 7, 2013, which it answered on November 27, 2013.  Following the District's supplemental briefing to this court, E.C. informed this court by way of letter, received on December 11, 2013, that she adopts the District's positions on two issues.  In determining whether a claimant's separation from employment was "due to domestic violence," she asks us to consider:  (1) applying a "substantial or significant cause of job loss," standard, which we read as synonymous with *amici*'s "substantial factor" standard, see *infra,* and (2) taking into account the "entire mosaic" of domestic violence.

benefits on account of engaging in "simple misconduct,"[2] by admitting her former boyfriend, who had a history of abusing her, onto the premises of her employer's residential facilities on three occasions, because she is entitled to benefits under D.C. Code § 51-131 (2010 Supp.), enacted to allow victims of domestic violence to receive unemployment compensation benefits in circumstances where they can show they have separated from their employment "due to domestic violence." E.C., *amici*, and the District urge us to interpret the language "due to domestic violence" broadly, to mean that any claimant who shows that domestic violence played a "substantial factor" in the claimant's separation from employment is eligible for unemployment compensation benefits, even if the claimant might otherwise be disqualified from receiving benefits, for reasons including misconduct, as alleged here.[3]

---

[2] D.C. Code § 51-110 (b)(2) (2001); 7 DCMR §§ 312.5 and 312.6.

[3] *Amici curiae* consisted of the following organizations and individuals: The Domestic Violence Legal Empowerment and Appeals Project (who presented at oral argument); Ayuda; Bread for the City; Catherine F. Klein, Professor of Law and Director of Columbus Community Legal Services, Columbus School of Law, Catholic University; D.C. Volunteer Lawyers Project; District of Columbia Coalition Against Domestic Violence; Legal Aid Society – Employment Law Center; Legal Momentum; and Lisa Vollendorf Martin, Professor of Law and Co-Director, Families and the Law Clinic, Columbus School of Law, Catholic University.

In the alternative, E.C. challenges the ALJ's simple misconduct finding on the basis that the ALJ failed to engage in "the reasoned analysis" required for misconduct cases when he did not consider material facts and issues tending to negate any misconduct on E.C.'s part, citing *Hamilton v. Hojeij Branded Food, Inc.*, 41 A.3d 464, 477 (D.C. 2012). Specifically, E.C. alleges that the ALJ failed to "meaningfully analyze" the "underlying reasons" for her actions, namely, the domestic violence context that affected E.C. and her conduct toward her employer. *See Larry v. National Rehabilitation Hospital*, 973 A.2d 180, 183–84 (D.C. 2009).

With regard to the domestic violence statute, we conclude that, based on the statute's legislative history, remedial purpose to combat domestic violence and its impact on victims in the unemployment compensation context, as well as public policies underlying similar remedial legislation, the statute intends to allow for broad coverage of claimants whose separation from employment is "due to domestic violence." However, we emphasize that in order for a claimant to qualify for benefits under this provision of the statute, the claimant first must establish a causal nexus between the domestic violence and the claimant's separation from employment. To establish that a claimant's separation from employment was "due to domestic violence" under D.C. Code § 51-131, a claimant must show that: (1) the claimant suffered domestic violence that qualifies as an "intrafamily offense"

under the Intrafamily Offenses Act[4] ("IFOA"), along with qualifying supporting documentation, and (2) domestic violence played a "substantial factor" in the claimant's separation from employment.

In this case, we hold that E.C. established a clear causal nexus between the conduct that led to her termination from employment and the domestic violence that she suffered, thereby showing that domestic violence played a "substantial factor" in her separation from employment. Because E.C. established that her separation from employment was "due to domestic violence," under our interpretation of the statute's language, E.C. is eligible for unemployment compensation benefits. Accordingly, we reverse the ALJ's ruling partially disqualifying E.C. from benefits. Because we determine that E.C. clearly established that the instances of misconduct leading to her termination from employment were "due to domestic violence," we need not draw any conclusions on her alternate claim.

---

[4] D.C. Code § 16-1001 (8) (2009 Supp.).

## I. Factual Background

The uncontroverted evidence demonstrates that E.C. was in an abusive relationship with her ex-boyfriend, M.L., for over eleven months, during which time she tried to end the relationship no less than four separate times. While E.C. was involved with M.L., she began working for RCM, an organization that provides housing for persons with mental and physical disabilities ("residents"). To ensure the safety of the residents under RCM's care, it required all employees to observe a company policy prohibiting those not employed or authorized by RCM from accessing its residential facilities. RCM apprised all new hires, including E.C., of the policy at new hire orientation and company training, as well as in the personnel handbook provided to each employee.

Over the course of E.C.'s relationship with M.L., he exhibited controlling behavior that interfered with her work and became extreme and violent whenever E.C. attempted to end the relationship. For example, in separate instances, M.L. grabbed E.C. around her neck, vandalized her apartment building, kicked in her car window, slashed her tire, and stalked her at work. In another incident, M.L. repeatedly called E.C., came to her workplace, and tapped on the glass patio door of her workplace while he watched her ignore his calls. According to E.C., it was

M.L.'s abusive and controlling tactics, specifically his repeated attempts to invade her work space and stalk her at work, which led E.C. to permit him to set foot on RCM property on three separate occasions, in violation of RCM's policy prohibiting access to unauthorized persons, ultimately leading to her termination.

For example, during E.C.'s employment, M.L. showed up at her workplace multiple times despite her instructing him that he was not allowed on RCM's premises. According to E.C., M.L. appeared uninvited so often at her workplace that she could not "even give a number" for the times he appeared. In one such instance, E.C. felt compelled to speak with M.L. on a public street by the RCM facility because "it's safer for [her] to allow him to say what he needs to say so that [she] [could] remain safe." E.C. eventually ended the relationship with M.L. in March 2012, which led to M.L.'s final threat to get E.C. fired. Specifically, M.L. said: "[Y]ou think that you're going to hold your job? You're unfit to work here and I'm going to make sure that I call your employ[er]."

To protect herself against M.L., E.C. filed two temporary protection orders ("TPO") in August 2011 and March 2012, respectively, in the Domestic Violence Unit of D.C. Superior Court, both of which were granted and ordered M.L. to stay away from E.C.'s work and home, among other places. The court, however,

rejected E.C.'s September 2011 request for a civil protection order ("CPO"), which resulted in the lapse of her August 2011 TPO, because, according to the court, the parties seemed to agree on their desire to stay away from each other, given that M.L. had similarly filed a TPO against E.C.[5] E.C. later filed a second CPO against M.L. in March 2012 that the court granted. In that CPO, E.C. described numerous incidents, including how M.L. repeatedly came to RCM's residential facility at 110 Michigan Ave., Northeast, and how during one argument, he grabbed E.C.'s purse and then grabbed her neck.

With regard to her alleged misconduct, E.C. admitted that she voluntarily allowed M.L. onto RCM property on three occasions. During the first incident, M.L. allegedly followed her to RCM's residential facility on Alabama Avenue

---

[5] Under D.C. Code § 16-1003 (a) (2007 Supp.), "[a] petitioner . . . may file a petition for civil protection . . . against a respondent who has allegedly committed or threatened to commit one or more criminal offenses against the petitioner." While the petition for a CPO is pending, the court may issue a TPO for a period of up to fourteen days if it "finds that the safety or welfare of the petitioner . . . is immediately endangered by the respondent." D.C. Code § 16-1004 (b)(1)-(2) (2009 Supp.).

After conducting a hearing on the petition for a CPO, the court may issue a CPO if it "finds that there is good cause to believe the respondent has committed or threatened to commit a criminal offense against the petitioner." D.C. Code § 16-1005 (c) (2009 Supp.). The CPO may require the respondent to "refrain from committing or threatening to commit criminal offenses against the petitioner" and "stay away from or have no contact with the petitioner and any other protected . . . locations[,]" among other preventive measures. § 16-1005 (c)(1)–(2).

from her September 1, 2011 hearing at Superior Court, where she had attempted to file a petition for a CPO against him. Rather than risk M.L. "mak[ing] a scene at [her] workplace," and even though she warned M.L. that he should not be at her workplace, E.C. nevertheless allowed M.L. onto the property for twenty minutes while she prepared a meal for an RCM resident because "the last thing [she] needed was to lose her job."

On the second occasion, in November 2011, E.C. had asked M.L. to pick her up at work because she was not driving at that time, but when he arrived, she had not yet finished her work. While E.C. completed her duties for the day, her co-worker, Carolyn Harris, gave M.L. access onto the property, access to which E.C. appeared to acquiesce, or at least not explicitly deny. M.L. remained on the property for roughly two minutes, and did not interact with any of the RCM facility's residents. During the third incident, in December 2011, E.C. had requested that M.L. bring her breakfast to work because she had to "come into work unexpectedly and could not stop . . . to get breakfast [that] particular morning." E.C. admitted that she allowed M.L. to enter the property as far as the outer door of the apartment, where E.C. was caring for a resident, because she could not leave the residents alone. An RCM resident who had met M.L. at a

holiday party then invited him into the apartment. M.L. remained on the property "no longer than ten minutes."

RCM eventually terminated E.C. on the basis that she had violated company policy by admitting non-authorized persons onto company property in those three instances. Subsequently, E.C. filed for unemployment insurance benefits under D.C. Code § 51-109 (2001). The District of Columbia Department of Employment Services denied E.C.'s application for benefits on May 29, 2012, because RCM had terminated E.C. for violation of an employer rule, constituting employee misconduct. E.C. appealed that denial of benefits to the OAH.

On July 10, 2012, ALJ James Harmon presided over a hearing on E.C.'s eligibility for unemployment compensation benefits. Specifically, the ALJ determined the issues before him to be: (1) whether E.C. "engaged in any type of work-related misconduct that would warrant the denial of her receiving [these] benefits" and (2) whether D.C. Code § 51-131 applied to E.C.'s case on account of any domestic violence.

At the hearing, RCM presented evidence from three witnesses: Stacey Whitted, Human Resources Manager for RCM; Keesa Robinson, Support

Coordinator for RCM; and Paulette Robinson, Incident Management Coordinator for RCM. Ms. Whitted and Ms. Keesa Robinson both attested that M.L. was not an employee of RCM, and Ms. Robinson further testified that, as E.C.'s supervisor, she had not authorized M.L. to be on the property. Ms. Paulette Robinson testified that she personally advised E.C. of the policy on prohibited access by unauthorized persons to RCM facilities, for which, she confirmed, E.C. was terminated.[6] Notably, Ms. Robinson testified that prior to terminating E.C., RCM learned of her domestic violence issues with M.L. E.C. revealed to her employer that she had "a past violent history" with M.L., including "quite a few bad altercations." Ms. Robinson also testified that E.C. described multiple incidents where M.L. either appeared at RCM's residential facilities, or followed E.C. in the community while she served RCM residents.

At the hearing, E.C. testified about M.L.'s history of abusive behavior, including incidents intended to show M.L.'s interference with and effect on her

---

[6] RCM additionally presented documentary evidence showing that E.C. signed and acknowledged receipt of the policy manual, including a section that provides that an employee may be terminated for allowing unauthorized individuals onto company property.

Separately, Ms. Whitted conceded during her testimony that M.L.'s actions prompted RCM's investigation of E.C., rather than any independent concerns about E.C.'s job performance.

employment at RCM. To further support her claim of domestic violence, E.C. called a Licensed Independent Clinical Social Worker ("LICSW"), Heather Powers,[7] to testify as an expert witness on domestic violence. Ms. Powers testified that, in her opinion, E.C. had experienced domestic violence during her relationship with M.L., namely, through "[his] coercion and threats[,] . . . intimidation, . . . destroying [her] property, [inflicting] emotional abuse . . . [and] isolation, controlling what [E.C.] [did] . . . and using economic abuse, . . . [as well as] preventing [E.C.] from getting and/or keeping a job"; Ms. Powers also described M.L.'s stalking of E.C. through repeated unwanted contact.

Ms. Powers noted that M.L.'s actions made E.C. afraid and willing to comply with some of his requests in order to reduce the possibility of abuse, because M.L. carried out his threats against her, including ultimately depriving E.C. of her employment. Specifically, E.C.'s actions at RCM, including her allowing M.L. onto company property, were consistent with common patterns of abusive relationships involving domestic violence because by "doing things that were in compliance with [M.L.'s] desires . . . to have [E.C.] solely dependent upon

---

[7] Ms. Powers has more than seven years of experience as a LICSW in the field of domestic violence. She has conducted more than 250 assessments with victims of domestic violence and provided individual and group therapy to over 100 survivors of domestic violence.

him . . . she would keep herself safe, she would be more likely to keep any incidents that could involve others who were near her when these incidents happened . . . under control."

In a final order, the ALJ made a number of findings of fact based on the evidence presented. On the issue of misconduct, the ALJ found that RCM had a policy "which provides that an employee may be discharged for 'allowing unauthorized person(s) in RCM's facilities or riding in [a] company vehicle,'" which E.C. knew of and acknowledged when she received her personnel handbook on May 16, 2011. The ALJ also found that E.C. admitted M.L., either directly or indirectly, onto RCM property on three occasions in September, November, and December 2011. Lastly, the ALJ found that RCM ultimately terminated E.C. and sent her a letter on April 23, 2012, stating the reason for her termination as "failure to follow protocol regarding unauthorized staff in work locations."

With regard to her relationship with M.L., the ALJ determined that E.C. engaged in a "turbulent relationship" with him, during which a number of abusive events took place. However, the ALJ also found that E.C. took certain precautionary measures, such as seeking TPOs and CPOs against M.L. From these factual findings, the ALJ drew a series of legal conclusions. Specifically, the ALJ

determined that RCM failed to show that E.C. had committed gross or simple misconduct under D.C. Code § 51-110 (b) because RCM based its claim of misconduct on E.C.'s violation of an employer rule, and failed to meet its burden in proving "that it consistently enforce[d] its policy, as required by 7 DCMR § 312.7 (c)." Nonetheless, the ALJ independently determined that E.C.'s behavior constituted simple misconduct because E.C. allowed M.L. onto RCM's residential facilities on three occasions, and that these instances constituted "a willful and deliberate violation of [RCM's] interests." The ALJ decided that E.C. breached her duties and obligations to RCM because in each of the three instances, E.C. "directly or indirectly permitted [M.L.] to enter the worksite, she did so willingly and voluntarily, as there were no threats or coercive behavior from M.L. on those occasions."

The ALJ also acknowledged that the evidence demonstrated that E.C. was a victim of domestic violence, but found that the evidence in the record "[did] not show that, during those specific times [when E.C. allowed M.L. onto the property] that her actions were so adversely and severely affected by her being a victim of domestic violence, that she lacked the required intent to commit an act or acts that constituted misconduct under the [D.C. Unemployment Compensation] Act." Consequently, the ALJ disagreed with E.C.'s contention that she lost her

employment "due to domestic violence," and did not make an explicit ruling under D.C. Code § 51-131. This petition for review followed.

## II. Discussion

E.C. argues that the ALJ committed legal error because he erroneously failed to find that E.C. lost her employment "due to domestic violence," and further failed to explicitly apply D.C. Code § 51-131, the domestic violence statute, to determine whether E.C. qualified for unemployment compensation benefits under the statute. Specifically, E.C. claims that the ALJ improperly required her to demonstrate a strict causal nexus between her termination from employment and the alleged domestic violence, effectively placing the burden on E.C. "to show that her exposure to domestic violence negated a finding of misconduct," thus making the "special protection for domestic violence victims superfluous" under the statute. She contends that had the ALJ applied § 51-131, based on its language, purpose, and legislative history, he would have determined that she qualified for benefits under the statute because E.C. proved that domestic violence played a "substantial factor" in her separation from employment, even if it was not the "sole cause."

In assessing E.C.'s claim of eligibility under D.C. Code § 51-131, we first discuss the legal framework used to interpret statutory questions. We then determine how to define and prove "domestic violence" and interpret the "due to domestic violence" requirement under the statute. Lastly, we must decide whether, on this record, E.C. is entitled to the statute's protection and unemployment compensation benefits under our interpretation of the statute.

### A. Standard of Review and Statutory Construction

In reviewing an OAH decision, we determine whether: "(1) OAH made findings of fact on each materially contested issue of fact, (2) substantial evidence supports each finding, and (3) OAH's conclusions flow rationally from its findings of fact." *Rodriguez v. Filene's Basement Inc.*, 905 A.2d 177, 180 (D.C. 2006) (citations omitted). However, "the construction of a statute raises a question of law which this court reviews *de novo*." *Burton v. Office of Emp. Appeals*, 30 A.3d 789, 791 (D.C. 2011) (citation, internal quotation marks, and brackets omitted). "[W]e are presumed to have the greater expertise when the agency's decision rests on a question of law, and . . . therefore remain 'the final authority on issues of statutory construction.'" *Wash. Metro. Area Transit Auth. v. D.C. Dep't of Emp't Servs.*, 683 A.2d 470, 472 (D.C. 1996) (citations omitted).

In interpreting a statute as a matter of first impression, the "judicial task is to discern, and give effect to the legislature's intent." *Burton*, *supra*, 30 A.3d at 792 (citation omitted). "When statutory language is unambiguous, we are required to give effect to its plain meaning." *Hamilton*, *supra*, 41 A.3d at 474 (citation omitted). "The primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used." *Peoples Drug Stores v. District of Columbia*, 470 A.2d 751, 753 (D.C. 1983) (en banc) (citation omitted). We acknowledge, however, that sometimes the literal language of the statute is not enough, and that the statute must be read "in . . . light of the statute taken as a whole" and "against the backdrop of its policies and objectives." *Burton*, *supra*, 30 A.3d at 792 (citation omitted).

The District of Columbia's unemployment compensation statute creates a presumptive right to unemployment compensation benefits. *See* D.C. Code § 51-109; *Hamilton*, *supra*, 41 A.3d at 473. However, an employee is ineligible to receive benefits if the employee is discharged for "gross" or "other than gross" misconduct — commonly referred to as "simple" misconduct. D.C. Code § 51-110 (b); *see also Badawi v. Hawk One Sec., Inc.*, 21 A.3d 607, 613–14 (D.C. 2011) (noting that "[i]n every unemployment compensation case, the employer bears the burden of proving that the employee engaged in misconduct" (citations

omitted)). Although the "gross" and "simple" misconduct provisions operate to disqualify certain claimants from benefits, D.C. Code § 51-131 (a) provides an exception: "Notwithstanding any other provision of this subchapter, no otherwise eligible individual shall be denied [unemployment compensation] benefits for any week because the individual was separated from employment by *discharge* or voluntary or involuntary resignation *due to domestic violence* against the individual . . . ." (emphasis added). Domestic violence is defined under the statute as an "'intrafamily offense,'" *see* D.C. Code § 51-131 (b), as further defined under the IFOA, *see* D.C. Code § 16-1001 (8). To be eligible "to receive [unemployment compensation] benefits for separation from employment due to domestic violence," a claimant must "submit[] . . . support [for] the claim of domestic violence[,]" which a claimant can establish through various means, including:

> (1) A police report or record;
> (2) A governmental agency or court record, such as a court order, a Petition for a Civil Protection Order, or a record or report from Child Services; or
> (3) A written statement, which affirms that the claimant has sought assistance for domestic violence from the signatory, from a:
>> (i) Shelter official;
>> (ii) Social worker;
>> (iii) Counselor;
>> (iv) Therapist;
>> (v) Attorney;
>> (vi) Medical doctor; or
>> (vii) Cleric.

D.C. Code § 51-132 (2004 Supp.).

Because D.C. Code § 51-131 presents an additional pathway under which a claimant may qualify for unemployment compensation benefits, our task is to determine how the statute applies to an individual claimant, particularly in relation to the broader unemployment compensation benefits statutory framework. In so doing, we are mindful of reading the statute through the lens previously discussed for statutory interpretation case questions. Consequently, we conclude that four issues merit our consideration in interpreting and applying § 51-131, and its requirement that a claimant — here, E.C. — show that her separation from employment was "due to domestic violence": (1) what significance we should attribute to the statute's "notwithstanding" language, (2) how to define and prove "domestic violence" as an "intrafamily offense," (3) what causation standard should apply to our determination of whether an individual is separated from her employment "due to domestic violence," and (4) whether E.C. is eligible for benefits under § 51-131. In order to answer these questions, we are required to consider the IFOA and our case law defining domestic violence under the IFOA. And, given the public policy considerations inherent to the statute, we must also consider the domestic violence statute's legislative history and purpose, as well as the broader unemployment compensation statutory framework under which it falls.

*B. Interpretation of the statute's "notwithstanding" clause*

E.C. asserts that the "notwithstanding" language of D.C. Code § 51-131 indicates that the legislature intended this provision "to override conflicting provisions of any other section." E.C. cites to *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18 (1993), for support. We agree with this interpretation.

We had occasion to address a "notwithstanding" clause in *Burton v. Office of Employee Appeals*, *supra*, where appellants challenged the trial court's decision that they could be demoted without cause under the Metropolitan Police Personnel Amendment Act ("MPPA"). 30 A.3d at 790. In affirming the trial court's decision, we interpreted a provision of the MPPA intended to confer authority on the mayor or his delegee to return assistant chiefs of police and inspectors to the rank of captain, "notwithstanding" any other law or regulation, to mean that the provision "at a minimum[] . . . supersede[d] any conflicting regulations that were in place at the time the statute was enacted." *Id.* at 795. In rejecting appellant's argument that such an interpretation would eviscerate strong protections granted under the Comprehensive Merit Personnel Act to Career Service employees, which the MPPA amended, we concluded that a "notwithstanding" clause clearly

indicates the legislature's intent to override any other conflicting provision. *Id.* at 796 (referencing *Cisneros*, *supra*, 508 U.S. at 18, in its rationale).

Applying those principles to the domestic violence statute, the plain language of D.C. Code § 51-131 unambiguously overrides any conflicting provision within the same subchapter, which covers eligibility for, and disqualification from, unemployment compensation benefits. Therefore, § 51-131 is intended to supersede § 51-110 (b)'s disqualification of a claimant's unemployment compensation benefits for engaging in misconduct when that claimant is a victim of domestic violence, and shows that his or her separation from employment was "due to domestic violence" under §§ 51-131 and 51-132. To allow § 51-110 (b) to otherwise disqualify a claimant because of his or her misconduct, when that claimant loses his or her employment "due to domestic violence," would "work an obvious injustice" to the statute because it would fail to consider § 51-131's place in the overall unemployment compensation framework as a superseding provision. *See Burton*, 30 A.3d at 792 (providing that correctly interpreting a statute requires a contextual approach that leads to a "sensible construction" of the law in its entirety).

### C. Domestic violence as an "intrafamily offense"

As previously stated, D.C. Code § 51-131 (b) defines "domestic violence" as an "intrafamily offense," pursuant to the IFOA, D.C. Code § 16-1001 (8). Under D.C. Code § 16-1001 (8), "intrafamily offense" is defined as any "interpersonal, intimate partner, or intrafamily violence." "Interpersonal violence" is correspondingly defined as "an act punishable as a criminal offense that is committed or threatened to be committed by an offender upon a person," including one who is involved "in a romantic, dating, or sexual relationship with the offender." D.C. Code § 16-1001 (6) (2009 Supp.). Similarly, "intrafamily violence" refers to "an act punishable as a criminal offense that is committed or threatened to be committed by an offender upon a person to whom the offender is related by . . . domestic partnership." D.C. Code § 16-1001 (9) (2001). In determining whether an abuser's actions constitute "domestic violence," for purposes of D.C. Code § 51-131, E.C., *amici*, and the District suggest that this court read "domestic violence" broadly to include all the abusive actions taken by the abuser against a claimant throughout their relationship, that may constitute "intrafamily offenses," not just the specific actions directly leading to the claimant's termination. To support this broad definition of "domestic violence," the parties urge us to consider our jurisprudence on the IFOA, where we have

liberally construed "domestic violence" in order to further the Act's remedial purpose. *See Cruz-Foster v. Foster*, 597 A.2d 927, 929 (D.C. 1991). We find that framework appropriate.

First, we must determine whether any of the incidents leading to a claimant's separation from employment constitute "interpersonal" or "intrafamily violence," as well as what proof the claimant must show of this violence. D.C. Code § 16-1001 (6), (9). For example, in *Richardson v. Easterling*, 878 A.2d 1212 (D.C. 2005), we concluded that under the IFOA, an individual does not necessarily have to provide proof of a *criminal* act involving abuse or violence in order to establish an "intrafamily offense," because doing so placed an unintended limitation on the IFOA, which ran contrary to its "paramount consideration" as a remedial piece of legislation.[8] *Id.* at 1216-17 (citation and internal quotation marks omitted). Accordingly, we determined that, contrary to the trial court's ruling, a pattern of harassing behavior by petitioner's boyfriend that was committed "with the intent to cause emotional distress to [petitioner] by willfully, maliciously and repeatedly harassing [him]," was a sufficient, though not necessary, means of proving the

---

[8] We defined an "intrafamily offense" as "an act punishable as a criminal offense committed by an offender upon a person" with whom the claimant showed some type of relationship — in this case, the sharing of a "mutual residence" and involvement in a "romantic relationship." *Richardson*, *supra*, 878 A.2d at 1216 (citation omitted).

"intrafamily offense" of stalking. *Id.* at 1217; *see also* D.C. Code § 22-3133 (2009 Supp.).[9] We specifically recognized that stalking qualified as "*emotional* violence," one of the types of "domestic violence" which the IFOA was intended to protect against. *Richardson*, *supra*, 878 A.2d at 1217 n.6 (citation omitted) (noting that "the statutory language [of the IFOA] exclude[d] any notion that physical violence, or the threat thereof, was the only harm that the Act was designed to address"). Thus, like in *Richardson*, any pattern of conduct designed to cause emotional distress is sufficient, though not necessary, to constitute an "intrafamily offense" for purposes of D.C. Code § 51-131, so long as the claimant establishes the pattern of conduct through one of the means of supporting documentation under D.C. Code § 51-132, see *supra* Part II.A.

Although we have answered how to frame the substantive question of whether the claimant's proof conclusively establishes an "intrafamily offense," in making that determination, we must additionally consider what timeframe is

---

[9] To establish a pattern of harassing behavior to prove the offense of stalking, we note that a claimant may show the requisite "course of conduct" through *one* or more episodes of "harassing" behavior engaged in by the perpetrator. *See Shewarega v. Yegzaw*, 947 A.2d 47, 53 (D.C. 2008) ("[A]s a prophylactic measure imposed in the wake of an intrafamily offense, the CPO need not await the materialization of a full-fledged criminal pattern; rather, we think it must be read as proscribing even a single act of harassment, if that act otherwise satisfies the statutory definition of the offense.").

relevant in so doing. In this regard, we find it appropriate to take into account the public policy considerations behind the IFOA, which "was designed to protect victims of family abuse from acts and threats of violence," and to further consider that "the paramount consideration concerning th[e] legislation is that it is remedial." *See Cruz-Foster*, *supra*, 597 A.2d at 929 (citation and internal quotation marks omitted).

In *Cruz-Foster*, we assessed whether the trial court erred in denying a request to extend petitioner's CPO for "good cause," and ultimately remanded to the trial court because it had not considered the "entire mosaic" of petitioner's history of abuse, which we recognized "as critical to the determination" of whether petitioner met her burden in showing "good cause." *Id.* at 930–32 & n.3 (citing *In re S.K.*, 564 A.2d 1382, 1389 (D.C. 1989) (per curiam) (establishing that in child abuse and neglect cases, the judge must be familiar with the "entire mosaic" in order to best protect the child, the ultimate purpose of such a civil proceeding)); *cf. State v. Krol*, 344 A.2d 289, 302 & n.12 (1975) (establishing that "past conduct is important evidence as to [a defendant's] probable future conduct" when assessing a defendant's "dangerousness" for purposes of whether to commit the defendant acquitted by reason of insanity)). We specifically determined that the trial court improperly limited its consideration of whether petitioner met her evidentiary

burden to "an assessment of credibility with respect to the episodes" of abuse by petitioner's perpetrator, Foster, *after* his release from prison, rather than considering the entire history of abuse, spanning the time shortly after petitioner's marriage to Foster, Foster's criminal history of contempt for violation of a CPO, and the final abuse after Foster's imprisonment. *Cruz-Foster*, *supra*, 597 A.2d at 930-32. Accordingly, we remanded for additional factual findings. *Id.* at 932.

In coming to this determination, we noted the remedial character of the IFOA, which required asking "whether the 'balance of harms' favor[ed] the grant of [petitioner's] application," and the D.C. Council's intended "preference for a generous construction of the remedial provisions of the Act." *Id.* at 930–31. We find that the same remedial concerns that arose in *Cruz-Foster* similarly arise here, because, if we were to read too narrow a timeframe into the domestic violence statute for purposes of establishing proof of an "intrafamily offense," then claimants who establish proof of an "intrafamily offense[s]" suffered during the entirety of the relationship, but not during the isolated instances leading to their separation from employment would be disqualified from receiving benefits. This result would be anomalous to the underlying considerations of the IFOA — "to protect victims of family abuse from acts and threats of violence" and further its "remedial purpose" by "liberally construing" its provisions. *Id.* at 929 (citation

and internal quotation marks omitted). Accordingly, applying the foregoing considerations, we conclude that, in determining whether a claimant's proof shows evidence of an "intrafamily offense(s)," a reviewing court must consider the "entire mosaic" of the claimaint's history of abuse, not just the incidents directly leading to her separation from employment.

### D. The causation standard for interpreting "due to domestic violence"

Having determined that we should liberally construe whether there is "domestic violence," sufficient to constitute an "intrafamily offense," by considering the "entire mosaic" of domestic violence, we turn to what causation standard should apply in deciding whether an individual is separated from her employment "due to domestic violence." E.C., *amici*, and the District urge us to broadly interpret the "due to domestic violence" language, so that a claimant need only show that the "domestic violence" played a "substantial factor" in a claimant's separation from employment, rather than requiring that the "domestic violence" be the "sole cause" of this separation. We agree with their interpretation.

The causation standard required to support a finding that a consequence is "due to" a specific action is not easily or clearly defined. The Sixth Circuit defined

the degree of necessary causation for "due to" to mean that a miner seeking to prove his eligibility for black lung benefits under the Black Lung Benefits Act is only required "to show that his total disability was due 'at least in part' to his pneumoconiosis . . . [because] this more lenient interpretation is more consistent with the remedial purpose" of the legislation. *Peabody Coal Co. v. Smith*, 127 F.3d 504, 506 (6th Cir. 1997) (citations omitted).[10] At the other end of the spectrum, the D.C. Circuit observed that in assessing how much of a proposed U.S. Post Office rate adjustment must be "due to" exigent circumstances, "due to" can also be read to require a strict causal nexus where a result is "due *only* to," as opposed to "due *in part* to," a particular cause. *See U.S. Postal Serv. v. Postal Regulatory Comm'n*, 395 U.S. App. D.C. 122, 126, 640 F.3d 1263, 1267–68 (2011) (noting that the plain meaning of "due to" means "because of," "by cause of," or "as a result of," and remanding for the Commission to decide the separate issue of the necessary degree of causality required to warrant a rate adjustment for exigent circumstances when there is no similar plain meaning regarding "the closeness of the causal connection"). As such, "due to" is devoid of any clear meaning under D.C. Code § 51-131.

---

[10] In a prior case interpreting the Black Lung Benefits Act, the Sixth Circuit noted that "[th]e causal nexus of 'due to' has been given a broad variety of meanings in the law ranging from sole and proximate cause at one end of the spectrum to contributing cause at the other." *Adams v. Dir., OWCP*, 886 F.2d 818, 821 (6th Cir. 1989) (citation omitted).

Given the ambiguity of the plain meaning of "due to," our task is to "give effect to the legislative intent" of a statute whose language we have determined to be unclear; thus, D.C. Code § 51-131 must be read "in . . . light of the statute taken as a whole" and "against the backdrop of its policies and objectives." *See Burton*, *supra*, 30 A.3d at 792 (citations omitted). The District of Columbia Council's Committee Report makes clear that the statute is intended to:

> provide unemployment compensation to individuals who leave work because of domestic violence. Domestic violence victims are often stalked by their batterers at work, miss work due to injuries inflicted on them, and need time to obtain legal relief to keep themselves and their children safe. A lost job and income makes it even more difficult to leave the violent relationship. This bill will minimize how money factors into the decision to leave an abusive situation.

D.C. Council, Comm. on Public Servs., Comm. Report on Bill No. 15-436, 1 (Jan. 28, 2004) [hereinafter Comm. Rep.]. The testimony of Councilmember and Public Service Committee Chairman David A. Catania, who introduced the law, specifically recognized the pervasive and insidious nature of domestic violence and emphasized how the proposed legislation would address the interplay of domestic violence and a victim's separation from employment by providing a domestic violence victim with a sustainable economic future:

> Studies have shown that 96% of employed domestic violence victims experience problems at work related to the abuse and that 30% lose their jobs due to domestic violence. The violence experienced at home clearly

> impacts their ability to maintain and obtain employment. . . . Importantly, if a battered individual, especially a woman, loses her income, she is more likely to be forced to remain with[,] or return to the batterer because she is unable to support herself and her family. . . .
>
> [U]nemployment compensation is vastly greater [than TANF benefits[11]], which affords a battered woman a far better opportunity to achieve economic security after leaving an abusive relationship.

Hearing on Bill 15-436, The Unemployment Compensation and Domestic Violence Amendment Act of 2003, Before the Pub. Servs. Comm., 2003 Leg., Council Period 15 (Nov. 10, 2003) at 2:51–3:56 (statement of Councilmember David Catania, Chairman) [hereinafter "Hearing"].

In drafting the statute, the Committee also heard testimony from various domestic violence experts,[12] many of whom indicated that the legislation was critical for those whose jobs had been affected by domestic violence because the

---

[11]  Under the Temporary Assistance for Needy Families (TANF) program, needy families receive benefits intended to assist them in achieving self-sufficiency through state funding. *About TANF*, Admin. for Children & Families, http://www.acf.hhs.gov/programs/ofa/programs/tanf/about (last visited Dec. 10, 2013).

[12]  Expert witnesses included members of the American Bar Association's Commission on Domestic Violence, Women Empowered Against Violence, Inc. ("WEAVE"), the D.C. Coalition on Domestic Violence, My Sister's Place, D.C. Employment Justice Center's Program on Women's Employment Rights, and the D.C. Department of Employment Services.

legislation would provide victims with "much needed economic stability" when they might not otherwise be eligible for unemployment insurance benefits. Comm. Rep. at 3–6. To that end, the statute's liberal reporting requirements were intended to allow claimants the greatest possible chance to establish the requisite causal nexus needed to show eligibility for unemployment compensation benefits.[13] *See* D.C. Code § 51-132.

Further, looking to the legislative history, the D.C. Council's Committee on Public Services considered the actions taken by twenty-four other legislatures that passed similar legislation intended to "enabl[e] [domestic violence] victims to be eligible for unemployment insurance benefits if they separate from their jobs," Comm. Rep. 2, but specifically rejected limiting language enacted by certain jurisdictions, such as "directly due to domestic violence." *Compare* Ind. Code Ann. § 22-4-15-1 (c)(8) (West 2005) ("directly caused by domestic . . . violence"), *with* Cal. Unemp. Ins. Code § 1256 (West 2013) (leaving employment was necessary "to protect from" domestic violence), *and* Mass. Gen. Laws Ann. Ch. 151a § 25 (e) (West 2013) ("due to circumstances resulting from domestic

---

[13] And, as Councilmember Catania further noted, employers would not be burdened by the cost of providing domestic violence victims unemployment benefits: "It does not cost the employer anything. These are dollars that come from interest earned from the unemployment insurance fund." Hearing at 5:10-5:18.

violence"). By declining to modify "due to" with limiting language, e.g., "directly due to," the Council signaled that it intended the term "due to" to be broadly applied.

And, notably, the D.C. Council envisioned extending broad coverage under the statute because in 2010, it amended § 51-131 to extend benefits to individuals whose separation from work was due to domestic violence against "the individual *or any member of the individual's immediate family*[.]" *See* D.C. Law 18-192, § 2 (d), 57 D.C. Reg. 22 (May 28, 2010) (emphasis added). Accordingly, in our view, the Council's efforts to grant claimants the broadest possible coverage under the statute, and our consideration of other similar remedial legislation, counsels us against applying an onerous burden to the requisite showing that a claimant's separation from employment was "due to domestic violence." *See Wash. Times v. District of Columbia Dep't of Emp't Servs.*, 724 A.2d 1212, 1216–17 (D.C. 1999) (provisions of "remedial humanitarian legislation of vast import . . . must be liberally and broadly construed") (citation and internal quotation marks omitted)).

Although we have had no occasion to apply a broad causation standard to a remedial statute of vast import, we have used a "substantial factor" test in determining whether a plaintiff has proved legal cause in negligence and products

liability cases. *See Weakley v. Burnham Corp.*, 871 A.2d 1167, 1173 (D.C. 2005) (adopting Restatement (Second) of Torts § 431 (1965) test for legal cause in deciding whether to reverse summary judgment motion in products liability case); *Majeska v. District of Columbia*, 812 A.2d 948, 951 (D.C. 2002) (determining that a missing stop sign was the "cause-in-fact" of the accident injuring the plaintiff based on § 431's "substantial factor" test); *see also* Restatement (Second) of Torts § 431 (1965) (establishing that an "actor's negligent conduct is the legal cause of harm to another if . . . [the conduct] is a *substantial factor* in bringing about the harm" (emphasis added)). *Black's Law Dictionary* defines the "substantial-factor test" as synonymous with a "substantial-cause test." *Black's Law Dictionary* 1566 (9th ed. 2009). Specifically, a plaintiff in a negligence case shows that "causation exists when the defendant's conduct is an *important* or *significant* contributor to the plaintiff's injuries." *Id.* (emphasis added). Applied in the domestic violence context, we must determine whether the "substantial factor" test appropriately measures the causal nexus a claimant must show under the statute in order to qualify for benefits.

We find the "substantial factor" test fitting here because it recognizes that, although many causes may lead to a particular result, the true measure of whether a cause sufficiently establishes a nexus to the result is whether the cause *significantly*

brought about the end, not whether it is *solely* responsible for it. Given the type of behaviors often exhibited by victims of domestic violence, which, though intended to placate the perpetrators may simultaneously undermine certain employer codes of conduct, it is fitting that in this context, we adopt a test intended to require a claimant to show only that the "domestic violence" substantially led to her separation from employment.

To summarize, because D.C. Code § 51-131 is a remedial statute, it should be "liberally construed to accomplish its purpose and extend its coverage." *Hickey v. Bomers*, 28 A.3d 1119, 1126 n.10 (D.C. 2011) (citation omitted). Accordingly, the appropriate causation standard for establishing a claimant's separation from employment was "due to domestic violence," under § 51-131, is whether a claimant proves that the "domestic violence" played a "substantial factor" in her separation from employment, or, in the event of misconduct underlying a claimant's separation from employment, that "domestic violence" played a "substantial factor" in the incidents of misconduct leading to her separation from employment.[14] We note that whether a claimant meets the "substantial factor" test

---

[14] We note that the statute encompasses instances where a claimant voluntarily resigns or is terminated from his or her employment for reasons other than misconduct, as well as cases, like E.C.'s, where the claimant is terminated from his or her employment on account of misconduct. See *supra* Part II.A.

is a legal determination to be made based on the evidence in the record proffered by the claimant of the "domestic violence" and its effect on the claimant's separation from employment.

### E. E.C.'s eligibility for benefits under D.C. Code § 51-131

Applying the foregoing considerations here, we must determine whether: (1) E.C. suffered "domestic violence" that qualifies as an "intrafamily offense" under the IFOA and the reporting requirements of D.C. Code § 51-132, and (2) M.L.'s "domestic violence" against E.C. — assuming it so qualifies — played a "substantial factor" in her termination from employment such that her separation from employment was "due to domestic violence."

With regard to the first question, here, E.C. proved that she suffered "domestic violence" in two ways. First, she showed that at least on one of the three occasions leading to her termination from RCM, M.L. stalked her by following her from Superior Court to RCM's residential facility on Alabama Avenue, which qualifies as "interpersonal" or "intrafamily violence" sufficient to establish an "intrafamily offense," because when M.L. followed E.C. to her work, he did so with the "intent to cause [her] emotional distress." D.C. Code § 22-3133;

*Shewarega*, *supra* note 9, 947 A.2d at 53; *Richardson*, *supra*, 878 A.2d at 1217; *see also* D.C. Code §§ 16-1006, -1008, -1009. Second, giving due consideration to the "entire mosaic" of abuse committed by M.L. against E.C., E.C. sufficiently showed how M.L.'s actions as a whole constituted "domestic violence" and an "intrafamily offense" under D.C. Code §§ 51-131 and 16-1008 because his actions against E.C. constituted the kind of emotional violence similar to that suffered by petitioner in *Richardson*, against which the IFOA intends to protect. 878 A.2d at 1217 & n.6. Consequently, we agree with E.C. that, here, the ALJ failed to meaningfully weigh the entire history of abuse perpetrated by M.L. against her in determining that E.C. did not show her separation from employment was "due to domestic violence."

The ALJ did not consider how E.C.'s undisputed testimony, the testimony of her social worker, Ms. Powers, and documentary evidence, including various CPOs and TPOs that satisfy the reporting requirements of § 51-132, showed a pattern of abuse perpetrated by M.L. against E.C., during the entire course of their eleven month relationship. *See Cruz-Foster*, *supra*, 597 A.2d at 930–32. E.C. specifically testified that M.L. committed physical acts of violence and vandalism against her, as well as harassed and stalked her on multiple occasions, all of which establish "intrafamily offenses." *See* D.C. Code § 16-1008; *Richardson*, *supra*, 878

A.2d at 1217. Nonetheless, the ALJ limited his final determination that E.C. did not lose her employment on account of domestic violence to M.L.'s actions against E.C. during the three incidents where E.C. permitted M.L. onto RCM property because, according to the ALJ, the evidence "[did] not show that . . . [E.C.'s] actions were so adversely and severely affected by her being a victim of domestic violence[.]"

Instead, the ALJ focused his analysis too narrowly on E.C.'s actions during the three episodes of misconduct leading to her termination and failed to meaningfully weigh the "entire mosaic" of E.C.'s relationship with M.L. to better assess how that mosaic of domestic violence affected her conduct at work and resulting termination. Only after making such an assessment could the ALJ properly go on to determine the ultimate question of whether E.C. qualified for benefits under the domestic violence statute. Accordingly, the ALJ erred by not considering *all* of the evidence proffered by E.C. of the history of domestic violence when he determined that her separation from employment was not "due to domestic violence."

On the second question of whether E.C.'s termination was "due to domestic violence," we note at the outset that, in this case, we must consider whether the

domestic violence played a "substantial factor" in E.C.'s three instances of misconduct because the record clearly demonstrates that her employer terminated E.C. on account of what it determined to be misconduct, see *supra* Part I. Thus, E.C.'s termination and "separation from employment" stemmed from the misconduct.

Here, the record shows that domestic violence played a "substantial factor" in each incident of misconduct leading to E.C.'s termination from employment because each incident is linked to the entire history of E.C.'s relationship with M.L., which shows a continuing pattern of harassment, stalking, and threatening behavior at her place of work that ultimately led M.L. to inform her employer of the three incidents of misconduct, resulting in E.C.'s termination. Moreover, as the testimony of her expert, Ms. Powers, a licensed social worker, demonstrates, the incidents of misconduct illustrate a pattern of abuse whereby E.C. acted in ways "that were in compliance with [M.L.'s] desires . . . to have [E.C.] dependent upon him . . . [so that] she [c]ould keep herself safe" and reduce any future abuse. See *supra* Parts I & II.C. Significantly, Ms. Powers' testimony went unrefuted by E.C.'s employer, even though it had ample opportunity to proffer its own domestic violence expert. And, E.C. herself specifically testified that she allowed M.L. onto the company property because "the last thing [she] needed was to lose her job." *Id.*

We hold that E.C.'s evidence at the hearing of "domestic violence" and its effects on her employment shows that "domestic violence" played a "substantial factor" in the incidents of misconduct that led to her termination from employment, such that her separation from employment was "due to domestic violence" pursuant to D.C. Code § 51-131.[15] Accordingly, the ALJ committed reversible error in determining that E.C. failed to show that her termination from employment was "due to domestic violence," and further erred by not applying § 51-131 in order to conclude that, here, E.C. qualified for unemployment compensation benefits under the statute.[16]

E.C.'s case is a prime example of a victim of domestic violence whose experiences with domestic violence impacted her "ability to maintain . . .

---

[15] We note that, even though our holding in this case applies to a claimant terminated from employment, the same analysis would apply when determining whether a claimant who has voluntarily resigned from employment has established the requisite causal nexus proving that the claimant's separation from employment was "due to domestic violence" because both instances are contemplated under the statute. See *supra* Part II.D & n. 15.

[16] Here, we choose to reverse as a matter of law because the record sufficiently supports a finding of eligibility under § 51-131, and the ALJ's order neither discredits E.C.'s evidence, nor do we find any reason to doubt the veracity of E.C.'s testimony, or the conclusions of her expert, particularly when these stand uncontradicted. *Cf. Hamilton*, *supra*, 41 A.3d at 480–82 (reversing the ALJ's finding of misconduct where the ALJ failed to consider undisputed material testimony and E.C.'s evidence tending to negate any misconduct, and made no indication otherwise discrediting E.C.'s credibility).

employment." Hearing at 2:51–3:56. Rather than stay with the perpetrator, E.C. chose to end the relationship and continue "to [try to] achieve economic security after leaving an abusive relationship." *See id.* E.C.'s case squarely fits within the purpose of the statute — to provide unemployment compensation to an individual who is "separated from employment by discharge . . . *due to domestic violence against the individual.*" D.C. Code § 51-131 (a) (emphasis added).

## III. Conclusion

For the foregoing reasons, the decision of the ALJ is reversed, and the case is remanded with instructions to grant E.C.'s application for unemployment compensation benefits under D.C. Code § 51-131.

*So ordered.*